THE CARBORUNDUM COMPANY, PETITIONER, *v*. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 12960. Promulgated March 4, 1949.

*R. J. Bird, Esq.*, and *H. A. Mihills, C. P. A.*, for the petitioner.
*Harold Thomas, Esq.*, for the respondent.

HARLAN, *Judge*: This proceeding involves deficiencies in income, declared value excess profits, and excess profits taxes for the calendar year 1940 in the respective amounts of $417.17, $79.23, and $2,482.12. The petitioner claims refund of such taxes in an aggregate amount in excess of $100,000.

Two issues raised by the pleadings with reference to depreciation and New York City sales taxes have been conceded by the respondent. The questions presented for our determination are the following:

(1) Is petitioner entitled to relief from excess profits tax for 1940 under section 721 of the code through the application of net abnormal income to prior years?

(2) Did respondent err in applying the limitation on credit for foreign taxes against petitioner's excess profits tax under section 729 (d) of the code?

(3) In determining the base period net income, is petitioner entitled to adjustments for abnormal deductions under section 711 (b) (1) (J) of the code?

(4) Did respondent err in decreasing net income for the base period year 1936 by additional income tax for that year attributable to the increase in income occasioned by the disallowance of $233,756.25 as an abnormal deduction for bad debts?

(5) Is petitioner entitled to an adjustment of $1,617.40 to income for its base period year 1936 for a fire loss?

## *Issue 1.*

### FINDINGS OF FACT.

The petitioner is a corporation, organized under the laws of the State of Delaware, with principal office at Niagara Falls, New York. The returns and claim for refund for the period here involved were filed with the collector of internal revenue for the twenty-eighth district of New York.

Petitioner is engaged in the manufacture and distribution of abrasive and refractory materials.

The Carborundum Co., Ltd., is a Canadian corporation the stock of which is wholly owned by petitioner, having been acquired in or about the year 1919. It is not a foreign personal holding company. Both the petitioner and the Canadian subsidiary have kept their books and made their income and excess profits tax returns on the calendar year basis under the accrual method.

Petitioner computed its excess profits net income for the calendar year 1940 under the income credit method.

Dividends of the Canadian subsidiary were paid to petitioner during the year 1940 in the aggregate amount of $615,000, less exchange of

$60,940.35, or a dividend in American dollars of $554,059.65. These dividend payments were made on July 13, 1940, in the sum of $375,000; on July 16, 1940, in the sum of $120,000; and on September 30, 1940, in the sum of $120,000, which amounts when converted into American dollars were at the three respective dividend payment dates $337,841.25, $108,109.20, and $108,109.20.

The earnings of the Canadian subsidiary for the year 1940 were $900,303.08 and the Canadian tax thereon was $429,327.92, leaving a net of $470,975.16.[1]

Earnings of the Canadian subsidiary for the year 1939 were in the amount of $470,090.57, less Canadian tax of $94,018.16, or accumulative profits of $376,072.41.[1]

The only foreign dividend received by petitioner during the base period years was for the year 1938, when $405,000[1] was received from the Canadian subsidiary. The average amount of foreign dividends received during the four base period years 1936 to 1939, inclusive, was therefore $101,250. Petitioner computed 125 per cent of that average as $126,562.50 and claimed abnormal income for the year 1940, as follows:

| | | |
|---|---|---|
| Dividend from Canadian subsidiary | | $615,000.00 |
| Less exchange | | 60,940.35 |
| | | 554,059.65 |
| Dividend from Canadian subsidiary during 1936, 1937, 1938, 1939 | $405,000.00 | |
| Average for four years | 101,250.00 | |
| 125 per cent of average | | 126,562.50 |
| Net abnormal income | | 427,497.15 |

There were no direct costs or expenses deductible in determining the normal tax net income of the petitioner for the calendar year 1940 through the expenditure of which the dividends aggregating $615,000 ($554,059.65 in American dollars) were in whole or in part derived.

### OPINION.

In computing its excess profits net income under the income credit method in its corporate excess profits tax return for 1940, the petitioner did not deduct any amount as abnormal income attributable to other years. In its petition filed in this proceeding, however, it alleges that the respondent erred in failing to eliminate, from its excess profits net income, abnormal income represented by dividends received from a foreign corporation attributable to prior years.

---

[1] Figures are expressed in terms of U. S. dollars.

Petitioner contends that, since the earnings of its Canadian subsidiary for the year 1940 available for payment of dividends were $470,-975.16 and were exceeded by the amount of dividends of $554,059.65 actually received by it from the subsidiary during the year 1940, the excess ratable portion of the dividends received at the respective dates July 13, 1940, July 16, 1940, and September 30, 1940, represented and constituted abnormal income of the year 1940, which was attributable to prior years in the amount of $201,471.69. This abnormal income, according to petitioner, consisted of dividends paid out of earnings of the preceding year at each of the 1940 dividend payment dates of July 13, July 16, and September 30, in the respective amounts of $86,911.94, $104,248.66, and $10,311.09. Petitioner arrives at the amount of abnormal income attributable to prior years by the following computation:

| | |
|---|---:|
| Income of foreign subsidiary corporation for 1940 in United States dollars | $470,975.16 |
| Earnings to July 13, 1940—U. S. dollars | 250,929.31 |
| Dividend paid July 13, 1940 | 337,841.25 |
| Out of earnings of prior years | 86,911.94 |
| Earnings to July 16, 1940—U. S. dollars | 254,789.85 |
| Less earnings to July 13, 1940—U. S. dollars | 250,929.31 |
| | 3,860.54 |
| Dividend paid July 16, 1940—U. S. dollars | 108,109.20 |
| Out of earnings of a prior year | 104,248.66 |
| Earnings to September 30, 1940—U. S. dollars | 352,587.96 |
| Less earnings to July 16, 1940—U. S. dollars | 254,789.85 |
| | 97,798.11 |
| Dividend paid September 30, 1940—U. S. dollars | 108,109.20 |
| | 10,311.09 |
| Abnormal income of $427,497.15 attributable to prior year | 201,471.69 |

Petitioner cites and relies upon *Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350. The facts in that proceeding, in so far as they are material here, disclosed that the taxpayer corporation on March 15, 1940, received from a Canadian subsidiary a dividend of $191,551.92 (in U. S. dollars), which was the first dividend ever paid by the Canadian corporation. Its earnings and profits accumulated during the period January 1 to March 15, 1940, were $10,350.94 (in U. S. dollars). This Court held that the amount of the dividend in excess of $10,350.94 represented net abnormal income attributable to prior taxable years, excludable from gross income for excess profits tax

purposes under the provisions of section 721 of the Internal Revenue Code.[2]

The facts in the cited case and those in the instant proceeding differ in an important respect. In the cited case we were apprised of the amount of the actual earnings of the Canadian corporation from the beginning of the year 1940 to the date of the dividend, and were able to reach the conclusion that the earnings and profits out of which the distribution was made, to the extent that they exceeded that amount, must have been attributable to prior years. In the instant proceeding the evidence does not disclose the actual earnings of the Canadian subsidiary for the period from January 1, 1940, to the dates of the three dividends, and petitioner attempts to justify its conclusion that the amount of net abnormal income attributable to prior years is $201,471.69 by indulging in the presumption that at the dates of the dividend payments the Canadian subsidiary had earned only a pro rata share of its net earnings for the entire year 1940 and that the balance of the dividends must have been paid out of 1939 earnings. There is, however, no presumption that earnings for a given year are

---

[2] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following paragraphs shall be held to describe a separate class of income:

* * * * * * *

(F) Income consisting of dividends on stock of foreign corporations, except foreign personal holding companies.

All the income which is classifiable in more than one of such subparagraphs shall be classified under the one which the taxpayer irrevocably elects. The classification of income of any class not described in subparagraphs (A) to (F), inclusive, shall be subject to regulations prescribed by the Commissioner with the approval of the Secretary.

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. * * *

(c) COMPUTATION OF TAX FOR CURRENT TAXABLE YEAR.—The tax under this subchapter for the taxable year, in which the whole of such abnormal income would without regard to this section be includible, shall not exceed the sum of:

(1) The tax under this subchapter for such taxable year computed without the inclusion in gross income of the portion of the net abnormal income which is attributable to any other taxable year, and

* * * * * * *

earned ratably during that year. Cf. *Dorothy Whitney Elmhirst*, 41 B. T. A. 348.

Petitioner says that it adopted the rule set forth in section 29.115–2 of Regulations 111 prescribing the method of determining the source of distributions for the purpose of income taxation,[3] which allows proration where actual earnings to the date of distribution can not be shown. Even if it be assumed, however, that this rule could be applied for excess profits tax purposes, there is no evidence herein that the actual earnings of the Canadian subsidiary to the dates of the distributions could not be shown. On brief, petitioner states that earnings of the Canadian subsidiary are determined annually, so that it would be impracticable to attempt to determine the earnings of the business at any particular point of the year other than at the close of business December 31, 1940. Petitioner does not say that such a determination could not be made, and in *Edwards* v. *Douglas*, 269 U. S. 204, the Supreme Court made the following pertinent comment:

* * * Nearly every business with a well-developed accounting system can, at any time, without the formal periodic inventory or closing of its books usual at the end of a fiscal year, determine approximately the amount of its current earnings, the amount accrued since the beginning of its fiscal year, and the part thereof undistributed. Many corporations do make such approximate ascertainment of profits monthly, or oftener; and, relying upon their system of cost accounting, they make distributions of current earnings without a closing of the books. * * *

The evidence discloses that the Canadian subsidiary had earnings for the year 1940, before taxes, of $900,303.08, of which $554,059 was distributed to petitioner on the three dividend dates. It well may be, as respondent urges, that an unusual amount of earnings in the early part of the year 1940 may have prompted the distributions in July and September and these earnings may have equaled or been in excess of $554,059. As the sole stockholder of its Canadian subsidiary, the petitioner was in a position to either show the actual earnings of the subsidiary at the respective dividend dates or show that the amount of the actual earnings to the dates of the distributions could not be shown. We need not decide whether or not, if petitioner had shown the latter to be a fact, proration to the date of the distributions would be permissible. Suffice to say that petitioner's failure to establish either of these facts compels us to reach the conclusion that it has not sustained its burden of proving that it had any net abnormal

[3] * * * In any case in which it is necessary to determine the amount of earnings or profits accumulated since February 28, 1913, and the actual earnings or profits to the date of a distribution within any taxable year (whether beginning before January 1, 1936, or, in the case of an operating deficit, on or after that date) cannot be shown, the earnings and profits for the year (or accounting period, if less than a year) in which the distribution was made shall be prorated to the date of the distribution not counting the date on which the distribution was made. * * *

income represented by dividends received from a foreign corporation which were attributable to prior years.

In its reply brief, petitioner urges, as an alternative contention, that it necessarily must be granted relief in the minimum amount of $83,084.49 representing the excess of the dividends which it received from its Canadian subsidiary during 1940 ($554,059.65) over the earnings of the subsidiary after taxes for that year ($470,975.16). In other words, the petitioner seeks to arrive at the amount of earnings of the subsidiary attributable to a prior year by comparing the earnings it realized during the entire year 1940 with the amount of the dividends which it distributed prior to the end of the year. This is in substance the same contention advanced by the Commissioner and disapproved by this Court in *Arrow-Hart & Hegeman Electric Co., supra.* In the cited case we made the following pertinent statement:

* * * Under section 721, the determination of the amount of abnormal income attributable to other years is of paramount importance in order to grant the relief sanctioned by Congress, and the regulations correctly prescribe that abnormal dividends must be attributed to the years in which were accumulated the "earnings and profits *out of which the distributions were made.*" Obviously, the dividend received by petitioner from its foreign subsidiary on March 15, 1940, did not have its origin in and was not attributable to any earnings accumulated in 1940, after the date this dividend was declared and paid, as such earnings had not been accumulated and were not in existence on that date. They were not and could not have been the "earnings and profits out of which the distributions were made." The earnings out of which the dividend distribution was made, therefore, must have been those which the foreign subsidiary had accumulated on and prior to March 15, 1940.

In the instant proceeding, the earnings out of which the distributions were made were those accumulated by the subsidiary prior to September 30, 1940. On that date the amount of the 1940 earnings may have been greatly in excess of the total amount of the dividend distributions. Moreover, the fact that the subsidiary's earnings for the entire year were less than the amount of the dividend distributions may have been the consequence of losses incurred between September 30 and December 31, 1940. The earnings at the end of the year are not, therefore, a sound basis upon which to determine the earnings out of which dividend distributions were made. It follows that petitioner has not established that it is entitled to relief in the amount of $83,084.49 merely by showing that its subsidiary's earnings at the end of 1940 were less than the amount of the dividends distributed during that year.

*Issue 2.*

### FINDINGS OF FACT.

In determining a deficiency in excess profits tax in the amount of $2,482.12, the respondent allowed a credit for foreign taxes against the

excess profits tax in the amount of $101,406.14. He computed the amount of this credit as follows:

| | |
|---|---:|
| Dividends from Carborundum Co., Ltd | $615,000.00 |
| Dividends from Aluminum Co., Ltd | 3,000.00 |
| | |
| Total foreign dividends in Canadian dollars | 618,000.00 |
| Converted into United States dollars at 90.091 | 556,762.38 |
| Credit for foreign taxes allowed against income taxes | 133,622.98 |
| | |
| Excess profits net income attributable to Canada | 423,139.40 |
| Total taxes paid or deemed to have been paid Canada on the above dividends | 241,211.23 |
| Amount allowed as credit against income tax | 133,622.98 |
| | |
| Balance | 107,588.25 |
| Limitation | 101,406.14 |

Respondent also determined that the excess profits net income of petitioner for 1940 was $4,467,510, and that, of the amount of the income tax ($1,121,830.93) allowed as a deduction in arriving at excess profits net income, $133,622.98 was attributable to Canadian dividends of $556,762.38 which were included in net income subject to income tax.

#### OPINION.

Section 729 (d) (1) of the Internal Revenue Code, relating to the limitation on the amount of foreign tax credit against excess profits tax, provides:

The amount of the credit in respect of the tax paid or accrued to any country shall not exceed the same proportion of the tax against which such credit is taken, which the taxpayer's excess profits net income from sources within such country bears to its entire excess profits net income for the same taxable year; * * *

Petitioner and respondent disagree as to the meaning of the words "excess profits net income from sources within such country," and as a result they differ in their computations of the amount of credit for foreign taxes to be applied against petitioner's excess profits tax. The computation of the respondent is as follows:

$$\frac{\text{Excess profits net income from Canadian sources } \$423,139.40}{\text{Excess profits income } \$4,467,510.20} \times \text{excess profits tax } \$1,070,645 = \$101,406.14$$

The petitioner urges that the correct computation is as follows:

$$\frac{\text{Excess profits net income from Canadian sources } \$556,762.38}{\text{Excess profits income } \$4,467,510.20} \times \text{excess profits tax } \$1,070,645 = \$131,113.38$$

Limit $107,588.25

Both parties agree that the only dispute is with respect to the figure to be used as the numerator of the fraction. That depends upon whether petitioner's excess profits net income from Canadian sources was $423,139.40, as the respondent urges, or $556,762.38, as petitioner urges. We agree with respondent. $556,762.38 represents the total income which petitioner received from Canada. In determining the excess profits net income from this source, the total income has to be reduced by the portion of the income tax, allowed as a deduction in computing excess profits net income, which is attributable to the receipt of the Canadian income. This amounted to $133,622.98. The respondent correctly determined, therefore, that petitioner's "excess profits net income from sources within" Canada was $423,139.40 ($556,-762.38 less $133,622.98) and this is the correct figure to use as the numerator of the fraction.

## Issue 3.

### FINDINGS OF FACT.

In the determination of the income for the base period year 1936 respondent has allowed an adjustment of $233,756.25 as abnormal bad debts (sec. 711), thus increasing 1936 income, and he has reduced that income for 1936 by the amount of $5,966.31 deemed to be a proper deduction for New York City sales taxes which were later paid in the year 1940. He has also reduced 1936 income by $38,078.01 income tax considered by him as applicable to the net increase in 1936 net income occasioned by several adjustments, including the two mentioned above.

### OPINION.

Subsection (b) of section 711 provides the method by which excess profits net income for the taxable years in the base period is to be computed. For any taxable year subject to the Revenue Act of 1936 it provides that the excess profits net income shall be the normal tax net income as defined in section 13 (a), with certain adjustments specified therein. One of the adjustments listed in subsection (b) (1) (A) requires that "The deduction for taxes shall be increased by an amount equal to the tax * * * for such taxable year under Title I or Chapter 1, as the case may be, of the revenue law applicable to such year." This provision was repealed by section 202 (c) (2) of the 1941 Act, effective under section 205 of that act for taxable years beginning after December 31, 1940. It is applicable, however, to the taxable year 1940 which is involved in this proceeding.

Subsection (a) (1) (A) of section 711 provides for the same adjustment in computing excess profits net income for the taxable year

1940.[4]   The House Ways and Means Committee report accompanying the bill containing this provision stated that "The deduction for taxes paid or accrued under the law applicable to the taxable year is to be increased by an amount equal to the amount of the tax under Chapter 1 payable for such taxable year." Report No. 2894, 76th Cong., 3d sess., p. 19.   No further comment was made by either the Ways and Means Committee or the Senate Finance Committee with reference to the provisions of subsections (a) (1) (A) and (b) (1) (A) of section 711.

In this proceeding respondent decreased petitioner's net income for the base period year 1936 by the amount of $38,078.01, which he considered to be the additional income tax attributable to the disallowance of $233,756.25 as abnormal bad debts.   In support of this determination he argues that we are dealing with the taxable year 1940, for which the normal tax is subtracted from normal tax net income in arriving at excess profits net income; that the experience of the base period years, 1936 to 1939, inclusive, has been granted by statute and used by petitioner as a measure of its credit to be allowed and deducted so that excess profits income for 1940 may be determined; that a consistent attitude should be adopted so that the norm of experience will not be distorted; and that if the normal tax for 1940 is deductible in arriving at excess profits income, the purpose of the statute would be thwarted if the net income for 1936 were not similarly treated.   He relies upon section 711 (b) (1) (A) as authorizing this decrease in petitioner's net income for 1936.

We do not agree with the respondent.   The wording of subsections (a) (1) (A) and (b) (1) (A) of section 711 and the above quoted excerpt from the Ways and Means Committee report convinces us that Congress intended to provide therein for an adjustment in computing excess profits net income for the taxable year and for the base period years equivalent to the amount of the tax *payable* under chapter 1 for the year involved.   No tax is payable under chapter 1 because of an increase of income resulting from the allowance of an abnormal deduction for a base period year.   Moreover, the fact that Congress used the same wording in section 711 (a) (1) (A) relating to excess profits net income for the taxable year 1940, where no adjustment for an abnormality is involved, as it did in section 711 (b) (1) (A), relating to base period years where adjustments for

---

[4] SEC. 711. EXCESS PROFITS NET INCOME.

(a) Taxable Years Beginning After December 31, 1939.—The excess profits net income for any taxable year beginning after December 31, 1939, shall be the normal-tax net income, as defined in section 13 (a) (2), for such year except that the following adjustments shall be made:

(1) Excess profits credit computed under income credit.—If the excess profits credit is computed under section 713, the adjustment shall be as follows:

(A) Income Taxes.—The deduction for taxes shall be increased by an amount equal to the tax (not including the tax under section 102) under Chapter 1 for such taxable year.

abnormalities are provided for, indicates that it intended to authorize an increase in the deduction for taxes measured by tax payable under chapter 1 and not by a tax which might have been payable upon net income increased as the result of an adjustment for an abnormality made pursuant to the provisions of section 711 of chapter 2. Our decision on this issue is for the petitioner, and we hold that the respondent erred in decreasing net income for the base period year 1936 by additional income tax attributable to the disallowance of $233,756.25 as an abnormal deduction for bad debts.

## Issue 4.

### FINDINGS OF FACT.

Petitioner has claimed a number of adjustments for abnormal deductions in its base period income pursuant to section 711 of the Internal Revenue Code, all of which were denied by the respondent with the exception of the adjustment relating to bad debts. The amounts and items of adjustment for abnormal deductions now claimed by petitioner are as follows:

| Item | Abnormality claimed | | | |
|---|---|---|---|---|
| | 1936 | 1937 | 1938 | 1939 |
| Advertising* | *$38,794.49 | *$99,812.11 | | |
| Telephone and telegraph | | 4,727.77 | | |
| Industrial exhibits and conventions | 3,708.53 | | | |
| Entertainment | | 4,994.55 | | |
| Store conference expense | | 5,508.98 | $2,529.63 | $7,474.95 |
| Retirement annuities | 5,240.42 | | | |
| Deceased and sick benefits | 2,020.88 | | 8,445.88 | |
| Group life insurance | 2,868.10 | | | |
| Foreign exchange | | | 441.08 | 12,486.73 |

*Petitioner in its brief concedes any adjustments for 1936 and 1937 for advertising are so limited. Amounts originally claimed were $116,319.55 for 1936 and $201,549.71 for 1937.

The following deductions from gross income were claimed by the petitioner in its Federal tax returns and allowed by the respondent:

| Year | Advertising | Telephone and telegraph | Industrial exhibits and conventions | Entertainment |
|---|---|---|---|---|
| 1932 | $157,889.23 | | $10,687.75 | |
| 1933 | 162,217.46 | $42,984.89 | 13,741.37 | $6,251.29 |
| 1934 | 294,001.99 | 50,331.32 | 15,682.92 | 15,452.18 |
| 1935 | 244,019.60 | 58,267.63 | 21,461.65 | 20,705.68 |
| 1936 | 306,959.58 | 67,048.94 | 22,950.31 | 25,629.79 |
| 1937 | 414,559.69 | 73,050.51 | | 30,642.26 |

| Year | Store conference expense | Retirement annuities | Deceased and sick benefits | Group life insurance | Foreign exchange |
|---|---|---|---|---|---|
| 1932 | | | | $4,330.36 | |
| 1933 | | | | 6,682.43 | |
| 1934 | $139.63 | $75,641.89 | | 9,504.73 | |
| 1935 | 2,827.60 | 204,080.39 | | 10,656.18 | $7,431.75 |
| 1936 | 1,174.78 | 214,066.43 | $7,990.00 | 12,609.89 | 6,786.69 |
| 1937 | 8,910.73 | | 4,774.91 | | 6,981.81 |
| 1938 | 6,608.62 | | 14,415.00 | | 71,457.17 |
| 1939 | 13,575.49 | | | | 83,502.82 |

On its Federal tax return for the calendar year 1940 petitioner claimed deductions for the following expenses, which deductions were allowed by respondent:

Advertising _____ $212,933.29
Telephone and telegraph _____ 67,982.87
Industrial exhibits and conventions _____ 8,151.89
Entertainment _____ 25,647.71
Store conference expense _____ 3,401.75
Retirement annuities _____ 208,826.01
Sick benefits _____ 5,969.12
Group life insurance _____ 6,595.73
Foreign exchange _____ 71,016.09

The following is a break-down of petitioner's advertising expense for the years 1932 to 1937, inclusive, and for 1940:

| | 1932 | 1933 | 1934 | 1935 | 1936 | 1937 | 1940 |
|---|---|---|---|---|---|---|---|
| Salaries | $14,272.08 | $12,807.75 | $17,361.32 | $16,998.36 | $22,378.95 | $26,570.78 | $28,746.54 |
| Catalogs and price lists | 4,145.31 | 4,257.23 | 13,935.06 | 13,082.98 | 28,205.86 | 19,648.13 | 23,091.42 |
| Literature—circulars, flyers, etc | 19,681.59 | 17,230.05 | 32,196.82 | 35,259.75 | 39,725.71 | 51,057.47 | 28,460.92 |
| Advertising space. Preparation of advertisements | }47,395.85 | 44,239.00 | {68,271.11 | 68,735.28 | 79,098.42 | 99,948.23 | 81,754.50 |
| | | | 9,314.82 | 16,966.74 | 19,590.37 | 28,519.21 | 20,080.32 |
| Half tones and electrotype | | | 1,605.52 | 1,292.27 | 2,590.57 | 1,732.99 | 250.66 |
| Advertising novelties | 1,187.11 | 760.76 | 3,189.46 | 1,098.11 | 4,180.96 | 6,788.91 | 2,520.68 |
| Travel expense—advertising department | 632.94 | 1,831.24 | 1,244.89 | 2,283.23 | 2,818.34 | 2,633.95 | 1,682.08 |
| Incidental band expense | | | | | 1,073.94 | 4,237.99 | 167.50 |
| Mounted displays | 5,125.20 | 6,987.97 | 8,653.57 | 11,689.85 | 28,020.11 | 19,416.97 | 15,471.84 |
| Cutouts and display cards | 1,768.58 | 217.71 | 4,369.02 | 227.85 | 989.80 | 2,337.03 | 786.86 |
| Miscellaneous expense: Debit | 4,559.00 | 6,182.49 | 7,023.62 | 10,581.87 | 1,946.13 | 2,041.42 | 2,187.24 |
| Credit | (3,025.67) | (2,789.24) | (3,303.64) | (4,007.55) | (17,462.48) | (5,009.27) | (5,748.95) |
| Film expense | 1,188.50 | 965.80 | 3,519.96 | 1,603.38 | 3,336.95 | 24,338.10 | 10,581.10 |
| Radio broadcasting | 60,958.74 | 69,526.70 | 126,710.46 | 69,187.42 | 90,465.95 | 129,563.73 | _____ |
| Other display advertising | _____ | _____ | _____ | _____ | _____ | 734.05 | 2,900.58 |
| Total | 157,889.23 | 162,217.46 | 294,001.99 | 244,019.60 | 306,959.58 | 414,559.69 | 212,933.29 |

Many of the items in the above schedule of advertising expense are self-explanatory. "Salaries" include compensation paid to the advertising manager and his staff, consisting of clerks, stenographers, and secretary. During the years 1932 to 1940, with a few exceptions hereinafter referred to, petitioner followed the advertising practice of using space in practically all of the prominent trade papers in about twenty fields of industry. It published various booklets, circulars, catalogues, and price lists, and small mailing circulars called flyers. It had various types of mounted displays for displaying various products in hardware dealers' windows. It developed a motion picture sound film, and from 1928 to 1938 it maintained a radio program, during the course of which two minutes were devoted to telling listeners about the applications of petitioner's abrasive and refractory products in certain industries. The radio program was intended to give peti-

tioner and its products general publicity, and was not a selling type of program.

Substantial increases in advertising costs occurred after 1933. There was then a renewed demand for literature, circulars, flyers, etc., the supply of which had gone down considerably during the depression years. Advertising space in trade papers was increased substantially, using space in more papers and in more fields, in some instances the advertising space being doubled. There was also an increase in the cost of advertising space and in the preparation of these advertisements. This included increased plate-making charges, artists' fees, and a general setting of type, as well as increased advertising rates. Two additional salaried employees were placed on the advertising staff after 1933. The amount of literature, flyers, etc., did not increase in ratio to increased sales or additional customers, because much of it was furnished to hardware dealers who were using it as an aid to increase their business. While petitioner's customers were furnished with literature, price lists, and other informative media to acquaint them with its products, no money was ever spent directly in advertising in any given territory.

In December of each year petitioner prepared an annual advertising budget, and it made contracts at that time for the next year. It was then determined how much would be allocated during the following year to various forms of advertising. Petitioner did not look to the record of sales in any particular territory in determining its advertising program. Where a particular product was down, however, a little extra emphasis might be placed there, or advertising was sometimes discontinued where it was believed unproductive. Advertising expenses in the years 1932 to 1935, inclusive, were lower than in the following several years because they were depression years, and it was believed during that period that advertising pressure would not produce increased sales.

In the compilation of cost of trade paper advertising, the accounting details were separated after 1933 by the subdivisions advertising space, preparation of advertisements, half tones, and electrotype. Prior to that time they were combined in one cost account.

Advertising novelties, listed as a separate item of advertising cost in the schedule appearing above, includes such items as souvenir pocket stones in a leather case that petitioner sent out through various channels.

Increased traveling expenses, chargeable to advertising cost, in the years 1936 and 1937 over prior years resulted from increased activity on the road by the advertising manager, particularly in regard to public speaking and presentation of petitioner's motion picture film.

The cost of mounted displays increased in the years 1936 and 1937

over the previous years because of the increased cost of printing and art work, and because more pieces were then being printed and circulated. The same thing was true of cut-outs and display cards.

Film expense increased substantially in the year 1937 over previous years because of the production in that year of a new sound film. A great many prints of it were made for circulation through other channels, it being widely distributed through such channels as the Bureau of Mines and the Y. M. C. A.

The item of incidental band expense, mentioned in the advertising expense schedule, related to amounts paid for the band which provided music for the radio broadcasts.

The cost of petitioner's radio broadcasting fluctuated from year to year over the period 1932 to 1938, inclusive, because of the various cycles of broadcasting. In some years there were thirteen weeks of broadcasting, some eighteen, some twenty-two, and in the season of 1937-1938 the high of twenty-six weeks, with an increased number of broadcasting stations being used. The general trend of increased radio broadcasting cost was also accounted for by raises in radio time rates, some stations increasing their power, which increased their capability of reaching new audiences.

In 1938 sales executives of petitioner decided it would be of greater advantage to the company if the broadcasting money were used in a more direct selling effort. It was concluded to discontinue the radio broadcasting, using that money to add more men to the sales force, opening up more sales territory and developing a wider distribution of petitioner's products to distributors. The substantial reduction in advertising cost from $414,559.69 in 1937 to $212,933.29 in 1940 was accounted for partly by the elimination of the radio broadcasting, and because of a curtailment of space in trade papers, resulting from changed business conditions. Petitioner, together with other companies, was entering into war work, and it no longer had reason for continuing regular advertising procedure.

The increased "Telephone and Telegraph" expense for the year 1937 as compared to the four preceding years was due largely to an increase in the number of telephone and telegraph communications between petitioner and its customers relating to orders and shipping data. Certain costs may have been included under "Telephone and Telegraph" in 1937 that were not included under that account in other years.

The account styled "Industrial Exhibits and Conventions," for which expenditures for the years 1932 to 1936, inclusive, are listed above, records the cost of making and installing exhibits at the various industrial conventions throughout the country. These shows included the Metal Congress, commonly called the Steel Show, the

Foundry Show, Machinery and Tool, Tool Engineers, Chemical, and Power Shows. The expense would include the space purchased by petitioner in the exhibit hall, the equipment necessary, such as carpets, rugs, and hangings, and the expense of building the exhibit background. This was changed every five or six years in order to give a new presentation. The cost also included the expense of maintenance of the exhibit during the exhibit week, the travel and hotel expenses of the men brought from various territories to attend the exhibit and to meet customers, present and prospective. The expense was greatest in the years 1935 and 1936, when there was some redesigning of the exhibit background and at a time when petitioner was running a full complement of exhibits. Industrial exhibits and conventions are a form of advertising. The account for such expenditures comes under the general account for advertising on petitioner's books.

The expense account entitled "Entertainment," listed for the years 1933 to 1937, inclusive, records the cost of entertaining petitioner's customers and trade men by the sales staff, including salesmen and sales engineers. During the depression years entertainment by the sales staff was curtailed, because of lack of prospective new business, but in later years this policy was relaxed, resulting in the increased expenditures for the years 1936 and 1937.

"Store Conference Expense," as listed for the years 1934 to 1939, inclusive, comprises the expenses of petitioner's salesmen attending group conferences arranged at various convenient points throughout the country where petitioner's stores may be located. At one time petitioner had all of its salesmen come to Niagara Falls periodically, regardless of distance, to participate in the formation and discussion of sales programs. In order to reduce this expense and not keep the men who came from distant points away from their territory too long, it was decided to have group conferences, one, for example, in Detroit, to be attended by salesmen from the Chicago, Cleveland, and possibly Cincinnati districts. Another conference might be held in New York City, attended by petitioner's salesmen from Boston, Philadelphia, and possibly Pittsburgh. Group conferences of salesmen were not regularly held during the depression years, which accounts for the increased expenditures during the years 1937, 1938, and 1939. In addition, a sales or market analysis was undertaken about 1938, reaching its peak in 1939, when petitioner arranged to have a course given to its salesmen and other men in the sales organization by the Sales Analysis Institute. During the depression years, petitioner's salesmen attended what were known as Saturday conferences, coming into their own territorial store for discussion of sales plans. Later, and especially beginning in 1937, the periodic group conferences were called in certain general districts for the purpose

of the salesmen getting together with sales heads and sales executives for discussing the various problems in their territory pertaining to either new business or service to the customers. They would also use the conferences as a medium of exchanging ideas and experiences on various types of applications of abrasive and refractory products. They would also make a careful analysis of each state in their respective districts as to their present customers, how they were serving them, and the possibilities of increasing sales to present customers and of renewing former customers. The account also included the expense of some of petitioner's executives traveling from Niagara Falls to the various district store conferences.

In 1934 petitioner inaugurated as a welfare measure for its employees a plan for payment of annuities upon retirement of its employees. The plan was instituted voluntarily by the company, available to all employees after one year of service, including both factory and office employees and executives. The plan, started September 1, 1934, and still in effect, is administered by the Metropolitan Life Insurance Co. Under the voluntary plan the employee pays part and the company pays part of the cost. About 75 per cent of the employees participate in the retirement annuity plan.

The cost of administering the above mentioned retirement annuity plan changes in accordance with the number of employees participating. The larger the number of employees, the lower the cost of participation. For example, during the years 1934, 1935, and 1936 additional employees were participating and there was some increase in employment. In 1936, 2,119 people participated in the plan, whereas the number of participants in 1940 had dropped to 989, the annuity rate having increased from December 31, 1936, when it was $3.28 per month per $10 of annual annuity, to $5.11 per month per $10 of annual annuity at December 31, 1940. The lower number of people participating in the plan was partially caused by the Federal Old Age Benefit plan coming into existence and the increased cost of the plan had caused some employees who were participants originally to drop out as the years went along.

In July 1937 a change was made in the plan, which was about the time that the Federal Old Age Benefit plan went into effect, such changes being largely incident to qualification under the plan.

The cost of "Retirement Annuities" for the year 1936 was $214,066.43, computed in reference to 2,119 people participating at an annual cost of $3.28, or a total premium of $191,718.53 paid by the company. In addition, there were 26 employees not eligible to participate in the plan because of age. On those, the company made direct payments of $22,347.90, resulting in a total cost to petitioner of $214,066.43. The same basis of computation was used for the years 1934 and 1935, any

differences in total premium being accounted for by the different number of employees participating, or a change of effective rate.

Petitioner had a separate plan, entitled "Deceased and Sick Benefits," which provided for payments for supervisory employees, in the plant and the office, upon the death of a supervisor or under special conditions of ill health. This plan had no relation to petitioner's "Sick Benefit Association," established about 1895 for the benefit of the regular employees of the company. It was customary upon the death of a supervisor that the widow receive three months salary. In 1938 there was a considerable number of deaths involving death benefits. Included in the death benefits paid in 1938, amounting to $14,415, was a payment made to the widow of the vice president in the amount of $6,000, on the basis of three months salary, this substantial payment accounting for the increased expenditures in that year as compared to the two proceeding years. Other expenditures under this heading during the years 1936, 1937, and 1938 involved payments to two supervisory employees who were "sent away" because of ill health. Prior to 1936 similar expenditures may have been charged to another account.

Petitioner had another welfare plan for its employees, known as a voluntary low cost group insurance plan, also administered by the Metropolitan Life Insurance Co. Under this plan, a portion of the premium is borne by the company and the employee pays the remaining portion. The total cost to petitioner depends upon the number of employees participating in the group life insurance plan, the rate changing in accordance with the number of participants and the eligibility for increased amounts of insurance being based upon the time of employment or amount of regular compensation paid. The number of lives insured under the group plan was 1,848 in 1932; 1,837 in 1933; 2,297 in 1934; 2,440 in 1935; and 2,883 in 1936.

Petitioner made a loan arrangement with the Guaranty Trust Co. of London, England, which provided that the latter was to make loans in German marks to petitioner's German affiliate, Deutsche Carborundum Werke. Funds for this purpose were sent by petitioner to the London bank, and it made the loans, the payment of which was guaranteed by petitioner. Two of these loans were repaid by the German affiliate in 1938 in marks which had been devaluated to such an extent that petitioner, as guarantor, had to pay the London bank in that year $71,841.81 representing the difference in value of the German marks loaned to its German affiliate and those received from the affiliate at the time the loans were repaid. The difference between $71,841.81 and $71,457.17, deducted by petitioner as a foreign exchange loss on its return for 1938, or $384.64, represents a profit which petitioner determined it realized on foreign exchange due to the favorable rate

of exchange on the English pound in connection with sales to foreign customers in the English pound sterling area in 1938.

In 1939 the petitioner, as guarantor, paid the London bank the sum of $115,159.11 representing the difference in value of German marks loaned to its affiliate and those received from the affiliate at the time of the repayment of the loan. During the same year the petitioner reported a profit of $49,926.39, by reason of the payment of amounts it owed to the Canadian Carborundum Co., Ltd., in Canadian dollars, which had dropped in value in relation to the U. S. dollar, and a loss of $18,270.10, by reason of its absorption of exchange differences on shipments made to foreign countries. The amount of $83,502.82 deducted in petitioner's 1938 return as a loss on foreign exchange is the difference between $133,429.21 ($115,159.11 plus $18,270.10) and $49,926.39.

The foreign exchange deduction claimed by petitioner for 1940 was determined as follows:

|  | Item | Loss on exchange |
|---|---|---|
| Payment of dividends by Canadian Carborundum Co., Ltd., in July 1940 | $495,000 | $49,054.01 |
| Payment of dividends by: | | |
| Canadian Carborundum Co., Ltd., in September 1940 | 120,000 | 11,891.88 |
| Aluminum Co. in September 1940 | 750 | 37.50 |
| Loss on exchange re customers' accounts | | 10,032.70 |
| Total | | 71,016.09 |

On March 14, 1944, prior to filing of petition in this proceeding, the petitioner filed a claim for relief under section 722 of the Internal Revenue Code. Therein the petitioner stated that its claim was based upon the ground that it had changed the character of its business in three respects, viz: (1) A difference in the products manufactured, (2) a difference in capacity for production or operation, and (3) a change in operations. Change (1) involved the development, manufacture, and sale of two new products, one of which was diamond wheels, an abrasive product, and the other industrial resistors. For many years petitioner had been a large manufacturer of abrasive products and had a resistor department in which it manufactured radio resistors in large volume. Sales of diamond wheels started in 1935 and industrial resistors in 1937. Changes (2) and (3) consist of an improvement made in July 1937 in the heat treatment given grinding wheels through the use of a tunnel kiln rather than a round kiln formerly used; the air conditioning of its resinoid wheel department, which was started in February 1938 and completed in July of that year; the construction of a new building for the manufacture of K8 white aloxite, which was completed and put in use in the third quarter of 1937; a new building and additional

equipment for its wheel-finishing department, completed in the latter part of 1939; and the purchase on December 30, 1938, of property at Niagara Falls which had formerly been leased, thus eliminating rental expense.

For the years ended December 31, 1932 to 1939, inclusive, petitioner had net sales, gross profits from operations, other income, and total income as shown in the following tabulation prepared from petitioner's Federal tax returns:

| Year | Net sales | Gross profit | Other income | Gross income |
|---|---|---|---|---|
| 1932 | $6,571,961.81 | $2,285,979.55 | $425,055.94 | $2,711,035.49 |
| 1933 | 8,591,305.71 | 3,533,316.62 | 657,428.17 | 4,190,744.79 |
| 1934 | 10,822,208.59 | 4,860,028.13 | 765,899.05 | 5,625,927.18 |
| 1935 | 13,044,361.42 | 6,162,715.81 | 1,063,028.13 | 7,225,743.94 |
| 1936 | 16,289,966.30 | 7,835,043.27 | 1,164,764.03 | 8,999,807.30 |
| 1937 | 17,476,120.95 | 7,783,583.13 | 925,147.75 | 8,708,730.88 |
| 1938 | 10,847,615.94 | 4,299,374.26 | 1,656,324.32 | 5,955,698.58 |
| 1939 | 15,800,349.96 | 7,615,161.65 | 887,395.18 | 8,502,556.83 |

During some of its base period years the deductions taken by petitioner for advertising,[5] entertainment, store conference expense, and retirement annuities, were abnormal in amount within the meaning of section 711 (b) (1) (J) (ii) of the code, and petitioner's excess profits net income for the base period years involved should be adjusted by adding thereto the amount of the abnormality or excess in the amount of these expenditures, as limited by the provisions of section 711 (b) (1) (K) (iii) of the code. These abnormalities were not a consequence of an increase in the gross income of the petitioner in its base period, a decrease in the amount of some other deduction in its base period, or a change at any time in the type, manner of operation, size, or condition of business engaged in by the petitioner.

OPINION.

Petitioner contends that the respondent erred in failing to make adjustments for abnormal deductions in its base period net income. The applicable provision of the Internal Revenue Code is section 711 (b) (1) (J) and (K).[6] Petitioner urges that it is entitled to the claimed

[5] In computing the amount of any abnormality or excess in the amount of petitioner's expenditures for advertising, expenditures for industrial exhibits and conventions should be treated as a part of advertising expense.

[6] SEC. 711. EXCESS PROFITS NET INCOME.

(b) TAXABLE YEARS IN BASE PERIOD.— * * *

* * * * *

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made * * *

* * * * * * *

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the

adjustments because certain deductions taken by it in the base period years were abnormal in amount in that they were in excess of 125 per cent of the average amount of deductions of each class involved for the four previous taxable years.

The respondent's principal contention is that the petitioner has not established, as required by section 711 (b) (1) (K) (ii), that the abnormality or excess was not a consequence of an increase in the gross income or a decrease in the amount of some other deduction in the base period, and was not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by petitioner.

We are convinced that the abnormalities pertaining to expenditures for advertising (including amounts expended for industrial exhibits and conventions), entertainment, store conferences, and retirement annuities were not a consequence of any of the factors mentioned in section 711 (b) (1) (K) (ii), and have made a finding to this effect. The increased expenditures for retirement annuities were a consequence of a reduction in the number of people participating in the retirement plan which caused an increase in the annuity rate and in the amount of petitioner's contribution. The increases in the expenditures for advertising, entertainment, and store conferences were due to a number of causes, all of which have been set forth in detail in our findings. They include increases in cost of advertising space, rates, talent, radio station time, etc. The determination of the amount to be expended in any one year seems to have been based upon the prospects for increased business and the desirability of promoting increased sales. Thus, during the depression years, when prospects were poor, the expenditures were low; during the base period years, when prospects were good and more business was needed, expenditures increased; and, in 1940, when gross sales were $19,923,547.60 and gross profit from sales was $9,892,735.79, and petitioner was operating at or near capacity, its expenditures were lower than they had been in some of the depres-

---

approval of the Secretary, for the determination, for the purposes of this subparagraph of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J).—

(1) * * *

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

(iii) The amount of deductions of any class to be disallowed under such subparagraphs with respect to any taxable year shall not exceed the amount by which the deductions of such class for such taxable year exceed the deductions of such class for the taxable year for which the tax under this subchapter is being computed.

sion years. It may well be that the abnormal expenditures in the base period years contributed to an increase in the size of petitioner's business and in its gross income, but we are not concerned with any consequences of such expenditures. The question, as this Court pointed out in *Wentworth Manufacturing Co.*, 6 T. C. 1201, 1209, and *Pacific Gas & Electric Co.*, 7 T. C. 1142, 1150, is "the other way around," viz., Were the abnormal expenditures a consequence of an increase in gross income in the base period or of a change in the type, manner of operation, size, or condition of the business? We think petitioner has met its burden of proving that its abnormal expenditures for sales promotion were not a consequence of any of these factors.

In reaching this conclusion, we have not overlooked petitioner's claim for relief under section 722, which was introduced in evidence by the respondent. This claim is based upon three alleged changes in the character of petitioner's business, the substance of which has been mentioned in our findings. The only alleged change which is stressed by the respondent as having a possible bearing on the abnormalities is that relating to a difference in products manufactured. These new products, viz., diamond wheels and industrial resistors, become of importance in this proceeding only if it appears that their development and manufacture effected a "change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer." This Court has held that expenditures occasioned by a corporate taxpayer's entrance into a new field of business were made as a consequence of a change in the type of its business and not excludable from computation of base period income for excess profits tax purposes. *Surface Combustion Corporation*, 9 T. C. 631. In the cited case this Court also pointed out, however, that "bringing out a new model of a product regularly manufactured" is not such a change in the "type * * * of * * * business" as the statute contemplates.

For many years prior to the development and sale of the diamond wheel and industrial resistors, the petitioner had a large plant devoted to the manufacture of abrasive products and had a resistor department which manufactured radio resistors in considerable volume, and it did not enter into a new field of business when it started to manufacture and sell the diamond wheel, an abrasive product, and the industrial resistors. They constituted merely an improvement in or an addition to products regularly manufactured, and did not change either the type or the manner of operation, size, or condition of the business in which it was engaged. Even if it be assumed, therefore, that some part of the abnormal expenditures was a consequence of the addition of these two products, this would not preclude their disallowance.

The petitioner has not proved that the respondent's action in dis-

allowing the abnormalities claimed in connection with expenditures for "Telephone and Telegraph," "Deceased and sick benefits," "Group Life Insurance," and "Foreign exchange" was erroneous. The evidence relating to the "Telephone and Telegraph" discloses that in 1937 and for several years prior thereto telephone and telegraph expenditures increased each year in which there was an increase in petitioner's net sales and that they were due in large measure to telephone and telegraph communications between petitioner and its customers relating to orders and shipping data. The close relationship between these expenditures and the sales which caused the increases in petitioner's gross income over that of prior years is such that we can not find that the abnormality in amount claimed in 1937 was not a consequence of an increase in gross income. At the hearing the respondent's counsel asked two witnesses for petitioner whether it was true that the salaries of telephone operators were included in this account in 1937 and were not included therein in other years, including 1940. Each witness testified that he did not know the answer without referring to cost records, which, according to one witness, were in the court room. No attempt was made by petitioner to explain from these cost records how the salaries of telephone operators were treated, and the record leaves with us the impression that they may have been included in "Telephone and Telegraph" expense in 1937 and not in 1940. As to this item, therefore, our conclusion is that the petitioner has not established that the respondent erred in disallowing any adjustment for the claimed abnormality in 1937.

The evidence discloses that the petitioner maintained a separate welfare plan, entitled "Deceased and Sick Benefits," which provided for payments to be made to wives and members of the families of deceased supervisory employees and also for payments to supervisory employees under special conditions of ill health. Petitioner's sick benefit association handled benefits paid in cases of ordinary illnesses. It was customary upon the death of a supervisor that his widow be paid three months salary. A witness for petitioner testified that there were more deaths in 1938 than in 1936 and 1937; that the widow of a deceased vice president received $6,000 (three months salary) in 1938; and that two supervisors, who had to be "sent away" as the result of some extraordinary illness, received sick benefits. The witness was asked whether amounts paid out for deceased and sick benefits prior to 1936 were included in the pay roll record. He replied that he wouldn't say so, but did not know offhand, and that he did not recall that any men in the supervisory class died in those years. Petitioner could have shown from its books whether or not any deceased or sick benefits were paid to supervisory employees or members of their

families in years prior to 1936, and, if so, to what account such payments were charged. Its failure to definitely establish that there were no "Deceased and sick benefits" paid during the years 1932 to 1935, inclusive, compels us to reach the conclusion that it has not proved that the respondent erred in disallowing the claimed abnormalities as deductions in the years 1936 and 1938.

The evidence indicates that one of the factors causing an increase in expenditures for group life insurance in 1936 was an increase in the number of petitioner's employees participating in the group life insurance plan. Whether all or only a portion of the employees participated is not shown. We think it is reasonable to assume, however, that as the size of petitioner's business increased the number of those participating in the group insurance plan also increased. Petitioner's sales in 1936 showed a substantial increase over those of 1935 and prior years. Petitioner has not proved to our satisfaction that its increased expenditures for group life insurance were not a consequence of an increase in employees necessitated by such increased sales and gross income. Respondent's disallowance of any adjustment for this abnormal expenditure is approved.

The adjustments for 1938 and 1939 claimed for foreign exchange depend upon whether the losses which petitioner sustained in connection with loans made by it through the Guaranty Trust Co. of London to its German affiliate are classifiable as expense for foreign exchange or as losses from loans or guarantee of loans. We agree with the respondent that they should be classified under the latter heading, and, inasmuch as the evidence does not disclose what other losses petitioner may have had from loans or guarantee of loans, we can not determine whether or not the payments made to the London bank in 1938 and 1939 resulted in any abnormality in the amount of the deductions taken by petitioner in those years. The respondent did not err in disallowing the claimed foreign exchange adjustments.

## Issue 5.

The parties have stipulated that "A fire loss was sustained by petitioner, and an account maintained upon its books to reflect said loss was closed out in the amount of $1,617.40, in the year 1936." The petitioner contends that it is entitled to an adjustment in its base period income for 1936 because of this loss under the provisions of section 711 (b) (1) (E) of the Internal Revenue Code. This section provides that in the computation of base period net income for excess profits tax purposes "Deductions under section 23 (f) for losses arising from fires, * * * not compensated for by insurance or otherwise, shall not be allowed." Petitioner has not proved that the amount of this

fire loss was deducted in its return for 1936. Moreover, if such a deduction was claimed and allowed in 1936, there is no proof that the amount of this loss has not already been restored to 1936 income, inasmuch as it appears from petitioner's computation of its base period income for 1936 in its 1940 excess profits tax return that the amount of $35,300.64 for "casualty, demolition, and similar losses" was restored to income. Furthermore, we think that respondent is correct in his contention that no issue is raised in the pleadings regarding any adjustment for fire loss. Although the amended petition contains an allegation that the respondent erred in failing to disallow "abnormal deductions" during 1936 in the amount of $138,425, we are not convinced that this allegation was intended to include a claim for adjustment for the fire loss. Paragraph 16 of the stipulation discloses that petitioner originally claimed seven adjustments for abnormal deductions during its base period year 1936 aggregating $156,516.42 and the fire loss is not mentioned therein. Under the circumstances, we must hold that petitioner has not proved that it is entitled to any adjustment in its base period income for 1936 on account of the fire loss.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

TURNER, *J.*, dissenting: Under section 711 (b) (1) (K) (ii), deductions shall not be disallowed under section 711 (b) (1) (J) unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size or condition of the business engaged in by the taxpayer. In my opinion, the petitioner has not only failed to establish the things required of it under section 711 (b) (1) (K) (ii), but, to the contrary, the facts tend to show that the deductions taken for some, if not all, of the advertising, entertainment, store conference expense, retirement annuities, and group life insurance were a consequence of a change "in the type, manner of operation, size, or condition of the business engaged in by the taxpayer." It may be, also, that some of the expenditures were a consequence of an increase in the gross income of the taxpayer in its base period. In any event, I am unable to conclude from the facts set forth in the findings herein that they were not such a consequence.

I accordingly note my dissent.

DISNEY, *J.*, agrees with this dissent.