PACIFIC GAS AND ELECTRIC COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7966.   Promulgated November 13, 1946.

---

*Arthur H. Kent, Esq., Valentine Brookes, Esq.*, and *Robert H. Gerdes, Esq.*, for the petitioner.

*T. M. Mather, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge*: The facts essential to an understanding of the first issue may be stated briefly. The California Railroad Commission ordered the petitioner to reduce its rates for natural gas in July 1933. The petitioner made no change in its rates until May 1, 1936, when it reduced them to the level prescribed in the order. Meanwhile, it collected and reported as income the full amounts due under the old rates. It contested the order of the Commission in the Federal courts continuously until a final unfavorable decision was rendered in 1939. The petitioner then had to refund the excessive amounts collected from July 1933 to May 1, 1936. Those refunds were made in 1939 for which year a deduction was claimed and allowed representing the full amount of the refunds. The petitioner now contends that the entire deduction allowed for 1939 tax purposes should be disallowed, as abnormal under section 711 (b) (1) (H) of the Internal Revenue Code, in computing its excess profits credit for the years 1941 and 1942. The Commissioner has agreed to the disallowance of all but $668,067.70 of the deduction. This latter amount represents the refund of excessive rates collected for the period January 1 to May 1, 1936. The Commissioner has refused to disallow that part of the abnormal deduction on the ground that the petitioner has failed to show, as required by section 711 (b) (1) (K) (ii), that it was not a consequence of an increase in the gross income of the taxpayer in its base period.

The respondent makes only one contention in support of his determination on this item and tacitly agrees that otherwise the entire abnormal deduction should be disallowed. His argument is based upon the fact that the petitioner included in its income for 1936 the full amount of the excessive rates which it collected for the period January 1 to May 1, 1936. He reasons that the excessive collections for those four months of 1936 represented an increase in gross income of the base period over what the gross income of the base period would have been if the excess rates for that short period had not been col-

lected, and since the refund in 1939 of that excess was a consequence of the collection of the excess in 1936, section 711 (b) (1) (**K**) (ii) applies and that part of the abnormal deduction can not be disallowed. The stipulation shows that the gross income of the petitioner from gas sales for 1936 not only did not increase, but was actually less than it had been in 1935. Thus, there was a decrease in gross income from gas sales and a decrease in the rate charged during 1936. The petitioner argues that the refund in 1939 was not a consequence of an increase in its gross income in its base period, since the only gross income to which the refund bore any relation whatsoever was that of 1936 and its gross income from gas sales for that year decreased rather than increased. It says that the refund was a consequence of the order of the commission and the decree of the court and bore no relation whatsoever to the petitioner's gross income for the base period. It will not be necessary to discuss all of these contentions.

Heretofore, the gross income of one of the four years making up the base period has been compared with the gross income of the other years, or the gross income of a portion of the base period has been compared with the gross income of some other period or periods, to determine whether there has been an increase in gross income during the base period or during some portion of it. *William Leveen Corporation*, 3 T. C. 593; *Iron Fireman Manufacturing Co.*, 5 T. C. 452. The Commissioner, however, seeks to compare the actual gross income from gas sales of the first four months of 1936 with what he imagines the gross income of that same period would have been had the excessive rates not been collected. He cites no authority for this interpretation of the statute. His reasoning as applied to this case is specious and does not lead to a proper interpretation of the statute. The word "increase" is actually an impediment to this argument, which would be logical enough if that word were eliminated and the provision read "unless the taxpayer establishes that the abnormality is not a consequence of the realization of gross income by the taxpayer during the base period." We may not rewrite the statute. Furthermore, the respondent's interpretation would deprive the provisions of 711 (b) (1) (H) and (J) of much of their intended effect. Cf. *Green Bay Lumber Co.*, 3 T. C. 824, 830. The same argument could be applied to deny disallowance of a number of abnormal deductions. For example, it could be argued that abnormal deductions for bad debts from sales of goods during any of the base years could not be disallowed because the income of those years, though declining, was larger by reason of those sales than it otherwise would have been and, therefore, the abnormality in the bad debt deduction was a consequence of that "increase" in the gross income of the taxpayer in its base period.

We conclude that the construction placed upon 711 (b) (1) (**K**) (ii)

by the respondent is an improper one. We are aware, in reaching this conclusion, that the base period gross income includes the excessive rates upon which the disputed portion of the refund is based and that it may be illogical to allow the base period income to be increased by that amount and at the same time hold that it may not be decreased by allowing the deduction in question. If fault exists, it is due to the inadequacy of the statute and may not be avoided by an improper interpretation of section 711 (b) (1) (K) (ii). Since the respondent has raised only this one point in opposition to the petitioner's contention, we hold that the portion of the abnormality in dispute should be disallowed.

The petitioner's second contention is that a deduction of $206,616 which it claimed and was allowed in 1939 should be disallowed in computing its income credit under section 713 for 1941 and 1942. San Joaquin Light & Power Corporation, hereinafter referred to as San Joaquin, was a large public utility operating in the San Joaquin Valley in California. It owned a dam and power house, called the Kerckhoff plant, for the development of electric power on the San Joaquin River. Southern California Edison Co., Ltd., hereinafter referred to as Edison, had constructed in 1923 improvements upstream from the petitioner's plant on tributaries of the San Joaquin River. Edison instituted a proceeding before the Federal Power Commission in 1929 for an order compelling San Joaquin to contribute to the cost of maintenance and depreciation of the improvements. San Joaquin paid Edison $395,000 in 1937 pursuant to section 10 (f) of the Federal Power Act. San Joaquin was allowed a deduction in that amount for 1937. The Commission entered its order in 1939 requiring San Joaquin to pay to Edison the additional amount of $206,616. The petitioner meanwhile, on December 31, 1938, had caused San Joaquin to be dissolved and had acquired the bulk of its assets and had assumed its liabilities in a liquidation pursuant to section 112 (b) (6). The petitioner was required to pay and paid to Edison the sum of $206,616 just mentioned. It was allowed a deduction of that amount for 1939. The respondent concedes that this payment led to an abnormality, but has refused to disallow the deduction. He explained:

The award, made in 1939 covered liability for usage charges for years from 1923 to 1938 inclusive. Since payment by you in 1939 of this liability incurred by San Joaquin Light and Power Co. resulted from the liquidation transfer of assets at December 31, 1938, as previously set forth herein, the deduction was the consequence of a change in size, condition, and manner of operation of your business. Elimination of the deduction as abnormal is therefore denied under section 711 (b) (1) (K) (ii) of the Internal Revenue Code.

One of the contentions made by the petitioner is that this item was not a proper deduction from income for 1939. No consideration need be given to section 711 (b) (1) (K) (ii) if this contention is sound. We

think it is sound. The payment by the petitioner in 1939 pursuant to an order of the Federal Power Commission against San Joaquin requiring the latter "to contribute to the cost of maintenance and depreciation" of improvements from which San Joaquin benefited in years prior to 1939, as stipulated by the parties, or the payment by the petitioner in 1939 of an award against San Joaquin covering its "liability for usage charges for years from 1923 to 1938 inclusive" as determined by the Commissioner, would not be deductible by the petitioner under any of the provisions of section 23 of the code. The petitioner is a different taxpayer from San Joaquin. Items which might entitle San Joaquin to deductions would not necessarily entitle the petitioner to a similar deduction. The amount in question does not represent an ordinary and necessary expense incurred by the petitioner during the taxable year in carrying on its business, nor does it represent a reasonable allowance for the exhaustion, wear, and tear of property used in the trade or business of the petitioner. In short, it does not represent any of the deductions allowed under section 23. It represents a liability of San Joaquin which the petitioner had to discharge in order to protect its title to the San Joaquin assets acquired in the liquidation and was thus a part of the cost of acquiring the assets of San Joaquin.

The above is in accordance with the holding of the court in *Holdcroft Transportation Co.* v. *Commissioner*, 153 Fed. (2d) 323, affirming a memorandum opinion of the Tax Court. There the taxpayer had acquired the assets of a corporation in a tax-free transfer within section 112 (b)(5). Damage suits against the partnership were pending at the time and were later paid by the taxpayer. The following quotations are from the opinion of the court:

The claims did not arise out of the operation of the business of petitioner. The expense of settling them was not an operating expense or operating loss of that business, but a part of the cost of acquisition of the property of the partnership; * * *

* * * While the assets of the partnership transferred to the petitioner took the same cost basis in its hands as they had in the hands of its transferor, there is no justification for a ruling that petitioner could deduct from the gross income of its business, expenses or losses attributable to the operation of the business by its predecessor.

The present case is not distinguishable from the *Holdcroft* case. Furthermore, this is not a case of a statutory merger under state law in which the old corporate existence survived in the new and the expenses of the old would likewise be deductible expenses of the new. These two corporations were wholly different and separate. San Joaquin was "dissolved", not "merged." Finally, it may be pointed out that, while we are not deciding the income tax liability of the petitioner for 1939, yet it is necessary to decide, for excess profits

taxes for 1941 and 1942, whether or not this deduction was proper for 1939.

The petitioner acquired accounts receivable of San Joaquin in the liquidation already described. More than $82,000 of those accounts were ascertained to be worthless during 1939 and were charged off. A deduction was claimed and allowed on the return for that year. The parties are agreed that this deduction was abnormal under section 711 (b) (1) (J) to the extent of $77,572.29. The sole controversy on this third issue is whether the disallowance of this deduction is precluded by any of the provisions of section 711 (b) (1) (K) (ii). The Commissioner, in determining the deficiency, explained that the bad debt deductions involved in this issue were a consequence of an increase in the petitioner's gross income for 1939, including, as it did, the gross income from the former San Joaquin business, and was a consequence also of a change in the size, condition, and manner of operation of the petitioner's business.

The petitioner, prior to 1939, had furnished various services as a public utility in a large area surrounding San Francisco Bay. Its subsidiary, San Joaquin, had furnished similar services in the San Joaquin Valley. The petitioner, in other words, carried on business as a public utility directly, and it also carried on some business indirectly through its large subsidiary, from which it received substantial dividends. It dissolved the subsidiary at the end of 1938 and thereafter operated both branches of the business directly. That was a distinct change in the manner of operation of the business engaged in by the petitioner. The change led directly to the abnormality. The bad debt deductions which gave rise to the abnormality might have been taken by San Joaquin, but not by the petitioner, if the change just mentioned had not been made. It is not contended that there would have been any abnormality if these deductions had not been taken by the petitioner. Not only has the petitioner failed to show that the abnormality was not a consequence of a change in the manner of operation of its business, as required by section 711 (b) (1) (K) (ii), but the evidence indicates that the abnormality in this bad debt deduction was a consequence of the kind described in that section. The petitioner makes some contention that this conclusion should not affect 1942 because Supplement (A) is involved in that year. The petitioner has not made itself clear on this point or shown that our conclusion on this point should not affect 1942 as well as 1941.

The last issue for decision relates to the disallowance of an abnormality resulting from bad debt deductions for 1939 based upon loans to the San Francisco Bay Corporation. The petitioner, along with others, loaned large sums of money in the early part of 1939 and in

prior years to the San Francisco Bay Corporation, a California non-profit corporation, for the purpose of financing the exposition held on Treasure Island in San Francisco Bay in 1939. The petitioner advanced $250,000 prior to 1939 to the debtor pursuant to a general subscription agreement, and it loaned an additional amount of $825,000 in the latter part of 1938 and up to May 3, 1939, pursuant to another agreement. A number of others were parties to both agreements. These loans were secured by a pledge of revenues of the exposition and were covered by interest-bearing notes. These were all loans, not contributions. Partial payments were made on the indebtedness, but the exposition did not have the expected financial success and the petitioner determined in 1939 that the debts were worthless to the extent of $794,678.51. That amount was charged off its books and allowed as deductions on its return for 1939. The Commissioner, in determining the deficiencies for 1941 and 1942, refused to disallow this deduction on the ground that the petitioner had not established that the abnormality was not a consequence of an increase in the gross income of the taxpayer in its base period and was not a consequence of a change at any time in the type, manner of operation, size or condition of the business engaged in. He said that information on hand indicated that the petitioner's gross income was materially increased during the progress of the exposition in 1939 and in previous years in the base period.

The petitioner was the only public utility in the San Francisco Bay area which could have supplied the needs of the exposition for electric and gas service. It derived some business directly from the exposition. Total billings to the exposition for the period 1937 to 1940 amounted to $603,160.09. This represented only a small part of the petitioner's gross revenues during that period. The exposition business brought little profit to the petitioner and was not a desirable type of business because of its temporary character. The petitioner made the loans along with others because it believed that the exposition would benefit the area served by the petitioner and those benefits would, in turn, indirectly benefit it, and it made the loans with the expectation that they would be repaid in full.

The only question presented for decision on this issue is whether the disallowance of the deduction is precluded by any of the provisions of section 711 (b) (1) (K) (ii).

The respondent suggests in his brief that the $285,000 item was a contribution rather than a loan. The evidence shows, however, that it was a loan and not a contribution. Furthermore, if it were a contribution, the petitioner would not have been entitled to any deduction in 1939 and he would win as to a part without consideration of section 711 (b) (1) (K) (ii).

The respondent's main argument is that the abnormality in the bad debt deductions was a consequence of the increase in gross income produced by the exposition and was a consequence of a change in the type, manner of operation, size, or condition of the business, since the loans were made for the purpose of increasing the business and accomplished that result. That kind of an argument is fallacious, as we have heretofore pointed out. *R. C. Harvey Co.*, 5 T. C. 431. It may be that the loans contributed to an increase in the size of the business and to the gross income derived directly from sales to the exposition. But we are not concerned with any consequences of the loan or debts. Cf. *Wentworth Manufacturing Co.*, 6 T. C. 1201, 1209. The question is "the other way around"—were the abnormal bad debt deductions a consequence of an increase in gross income in the base period or of a change in the type, manner of operation, size, or condition of the business?

The gross income of the petitioner increased during 1939, but the evidence shows that the abnormality in the bad debt deductions based upon loans to the exposition was not a consequence of the increase in gross income. An abnormality in bad debt deductions based upon accounts receivable due from customers for services rendered might be a consequence of an increase in gross income and the corresponding increase in accounts receivable of that type. But the abnormality here in question did not result from increased accounts receivable due from customers for services rendered. Neither the loans nor the resulting bad debts were caused by, or were a consequence of, any increase in gross income. The occurrence of an increase in gross income did not lead in any way to the lending of the money, and, once the loans were made, their repayment depended upon factors other than the amount of the gross income of the petitioner. The abnormalities would have occurred regardless of whether or not there was any change in the gross income of the petitioner. There was no change in the type, manner of operation, or condition of the San Francisco Bay area business of the petitioner during the period of these loans and, consequently, the abnormality could not have been a consequence of any changes of that kind. The petitioner's business in that area grew, but, as we have heretofore stated, the growth did not cause or contribute to the loss on the bad debts and the loss was not a consequence of the change in the size of the business. We find no merit in the respondent's argument based on section 711 (b) (1) (K) (ii). Since the disallowance of the deduction is conceded to be proper, if not limited by that provision, we hold for the petitioner on this point.

Reviewed by the Court.

*Decision will be entered under Rule 50.*