DENMAN TIRE & RUBBER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19041.  Promulgated April 28, 1950.

*I. W. Sharp, Esq.*, for the petitioner.
*John A. Newton, Esq.*, for the respondent.

BLACK, *Judge*: This proceeding involves deficiencies in excess profits tax for the calendar years 1942 and 1943 in the respective amounts of $39,959.89 and $186,944.91. The deficiencies are due to numerous adjustments to petitioner's net income. Many of these ad-

justments are not contested by petitioner. Respondent's adjustments which result in the major portion of the deficiency were explained in a statement attached to the deficiency notice as follows:

*1942* (c) In your return for the year 1941, you reported a net loss of $4,990.87. You contend that said net loss should be increased by $75,500.00, for purposes of a carry-over net loss, by excluding that amount from gross income reported in the return. It is held that the amount of $75,500.00 constituted gross income within the meaning of Section 22 (a) of the Internal Revenue Code, and, further, that the net loss for 1941, available as a carry-over loss to 1942, is $4,534.04. The net operating loss deduction of $4,373.59 claimed on Item 27 of your 1942 return has, therefore, been increased in the amount of $160.45.

*1943* In your Excess Profits Tax Return for the year 1943, in the determination of your excess profits credit based on income, you claimed abnormal deductions in the aggregate amount of $69,464.72 in computing base period net income of $129,768.39 for the year 1939. Abnormal deductions in the amount of $749.84 have been disallowed within the provisions of Section 711 (b) (1) (J) of the Internal Revenue Code. The base period income claimed for 1939 has, therefore, been *decreased by $68,714.88 for purposes of the excess profits credit.*

The petitioner assigns errors as follows:

The determination of taxes set forth in said notice of deficiency is based upon the following errors:

(a) The inclusion as taxable income, in computing the taxable net income of Petitioner for the calendar year 1941, of a surplus credit of $75,500 arising out of the settlement during that year of an excise tax obligation of Petitioner to the United States of America in the amount of $125,500, for $50,000, with a resultant reduction of $75,500 in the net operating loss carryover from the calendar year 1941 to the calendar year 1942.

(b) The inclusion as taxable income, in computing the taxable net income of Petitioner for the calendar year 1941, of a surplus credit of $1,570.83 arising out of the purchase during that year, pursuant to direct negotiations with the holder, for $1,250, of bonds of Petitioner in the face amount of $2,500 on which interest had accrued to the date of purchase in the amount of $320.83, with a resultant reduction of $1,570.83 in the operating loss carryover from the calendar year 1941 to the calendar year 1942.

(c) The disallowance as a deduction in computing taxable net income for the calendar year 1942 of depreciation in the amount of $50.24 on furniture and fixtures acquired by Petitioner during that year.

(d) The disallowance as deductions in computing taxable net income for the calendar year 1943 of depreciation in the amount of $907.22 on molds and cores acquired during that year, depreciation in the amount of $47.77 on furniture and fixtures acquired during that year and depreciation in the amount of $7.02 on machinery and equipment acquired during that year.

(e) The failure to disallow in computing Petitioner's excess profits tax credit based on income, with reference to the calendar years 1941, 1942 and 1943, the following "class abnormalities":

(1) Bad debt losses on defalcations in the amount of $30,540.13 in the year 1939.

(2) Bad debt losses on accounts receivable taken over from Petitioner's predecessor corporation in the amount of $8,851.72 in the year 1938, and in the amount of $10,590.45 in the year 1939.

(f) Failure to disallow in computing Petitioner's excess profits tax credit based on income for the calendar years 1941, 1942 and 1943, the following "amount abnormalities":

| | Taxable Year 1941 | Taxable Year 1942 | | Taxable Year 1943 | |
|---|---|---|---|---|---|
| | Re 1939 | Re 1938 | Re 1939 | Re 1938 | Re 1939 |
| Bad debts | | $12,575.26 | | $23,641.62 | |
| Advertising | $16,171.11 | | $16,171.11 | | $16,171.11 |
| Professional serv | 0 | | 1,504.38 | | 2,521.12 |
| Factoring comms | 0 | | 8,880.05 | | 8,880.05 |
| Repairs | 12,570.78 | | 14,362.73 | | 12.02 |
| Total | 28,741.89 | 12,575.26 | 40,918.27 | 23,641.62 | 27,584.30 |

(g) Failure to take into account the loss of $1,560.70 for the year 1937 as reducing the income of the first half of the base period, in making the growth formula computation in Exhibit A (page 12) of Respondent's ninety-day notice (Exhibit A to this Petition).

### FINDINGS OF FACT IN GENERAL.

Most of the facts were stipulated and are so found. The stipulation of facts is incorporated herein by reference.

Petitioner is a corporation, incorporated on June 28, 1937, under the laws of the State of Delaware. During the years here involved petitioner's principal business and accounting offices were located at Warren, Ohio. Petitioner's books have been kept and its tax returns have been prepared and filed on the accrual basis. Petitioner filed its returns for the calendar years 1941, 1942, and 1943 with the collector of internal revenue for the eighteenth collection district of Ohio, at Cleveland.

Petitioner was organized to take over as of October 1, 1937, the assets and business of an Illinois corporation of the same name, subject to certain of its liabilities, pursuant to a revised plan of reorganization under section 77-B of the Bankruptcy Act of the United States, confirmed by an order of the District Court of the United States for the Northern District of Ohio, Eastern Division, dated April 2, 1937. The predecessor corporation was a manufacturer of tires, soles, and material for the recapping trade. It also manufactured molded rubber products for textile loom parts. About 75 to 80 per cent of its business was from the manufacture and sale of tires. Petitioner continued to manufacture approximately the same products after it was formed in 1937. Petitioner took over the assets of its predecessor and assumed most of the latter's liabilities as a part of the purchase price. The assets taken over by petitioner exceeded the liabilities assumed.

*Issues (a) and (b).*

Included among the liabilities assumed was an obligation owed to the United States Government arising out of manufacturers' excise taxes incurred by the predecessor corporation. Pursuant to the revised plan of reorganization, petitioner executed and delivered to the collector of internal revenue for the eighteenth collection district of Ohio a negotiable promissory note dated July 1, 1937, in the principal amount of $144,572.49. This was in payment of the liability for manufacturers' excise taxes incurred by the predecessor corporation. The note bore interest at the rate of 4 per cent per annum and it matured on April 2, 1940. The petitioner delivered to the collector a mortgage deed upon certain of the physical assets of petitioner as security for the note. The lien of this mortgage was junior to one securing bonds in the principal amount of $125,000. The petitioner made payments of principal and interest on the note until April 2, 1940. At that time there was $130,000 remaining unpaid. Petitioner, on April 2, 1940, delivered a second note, in the amount of $130,000, to the collector. This note provided for the payment of $2,000 a month, beginning October 1, 1940, and continuing until June 1, 1942, and $2,500 per month after such date until the balance of the note should be paid. As collateral security for this note there were delivered to the collector the prior note in the amount of $144,572.49 and the mortgage given in connection with the prior note. Petitioner made payments subsequent to April 2, 1940, in amounts which reduced the principal as of May 23, 1941, to $125,500.

Wilson B. McCandless (hereinafter referred to as McCandless), president of the petitioner, on May 8, 1941, wrote a letter to the Reorganization Division, Bureau of Internal Revenue, Washington, D. C., forwarding copies of petitioner's profit and loss statements and balance sheets for 1940. The letter states, in part, as follows:

You will notice from the Balance Sheet, that the working capital position is very serious. We have quite a large number of past due accounts payable and of course, this adds to our worries and makes it really impossible to maintain the schedule of payments to the Government upon which we agreed. I simply cannot see any way to make these payments during 1941 with our present financial set-up, and frankly, I am at a loss for some alternative suggestion.

\* \* \* \* \* \* \*

There is only one tentative suggestion that I have to make now. I believe that by pledging everything under the sun, I can raise $50,000. in cash, although I am not certain about this. I would be perfectly willing to undertake this, if the Treasury Department would consider a $50,000. cash payment in compromise settlement for the Government's claim against Denman.

The Balance Sheet shows $52,000. in bonds outstanding, and the remainder of the issue of $122,500. owned by the company. We have been forced to pledge

these bonds for bank loans, in order to pay the most pressing current creditors, consequently, in case of liquidation, I am afraid the Government's claim would not be paid in full. In fact, based on my experience in the tire business, the Government would probably realize a fairly small fraction of the indebtedness. For this reason, I think the Government may wish to accept $50,000. compromise settlement now instead of taking a chance on the future.

McCandless went to Washington several times during 1941 to discuss with representatives of the Internal Revenue Bureau the financial condition of the petitioner and its inability to make the payments due. He told them that, if payment in full were insisted upon, the Government would have to take over the entire factory. He was told the Government did not want the factory and for petitioner to make an offer of compromise. After discussion, a figure of $62,500 was arrived at as being a fair offer. McCandless was then asked to determine if the money could be raised. McCandless secured a promise to provide the money from financial interests. He then, on May 23, 1941, wrote a second letter to the Treasury Department in which he stated that during the year 1940 petitioner lost about $56,000 and that its working capital was very low. He further said that it did not appear feasible to maintain the present schedule of payments. He concluded in the letter that: "After discussing this matter with financial interests, I wish to submit a firm offer of $62,500.00 in full and final liquidation of the forementioned [sic] obligation."

The Acting Secretary of the Treasury on July 15, 1941, accepted "the offer of $62,500.00 cash, in full and final satisfaction of the two final promissory notes now outstanding if payment was made within thirty days."

After mailing the letter of May 23, 1941, making the firm offer of $62,500, McCandless found that the interests who had promised to advance the money had changed their minds. On August 5, 1941, McCandless requested a 30-day extension of the date of payment. This request was granted in a letter dated August 15, 1941. In a letter dated September 4, 1941, McCandless stated that he was unable to raise the agreed amount of $62,500, although he had canvassed every conceivable source. He stated, however, that he could raise $50,000 through a personal friend and he asked if this amount would be accepted in full payment. On September 22, 1941, McCandless stated that he had received a firm commitment for the $50,000 and he could pay it within 30 days of acceptance of petitioner's offer. Concurrently with the letters of September 4, 1941, and September 22, 1941, McCandless had further talks with the same representatives of the Internal Revenue Bureau. He stated that $50,000 was the most that he could raise. They told him to make doubly sure that he could raise that amount. On September 30, 1941, the Acting Secretary of

the Treasury accepted the offer to pay $50,000 "in full satisfaction of the outstanding balance due on the notes in the amount of $125,-500.00." This amount was paid and the collector surrendered to petitioner the notes and mortgage. There is no proof that the value of the assets taken over by petitioner was less at the date of compromise of the indebtedness than at the date of acquisition.

Prior to October 17, 1941, Elizabeth H. Paecke was the owner of certain outstanding bonds of petitioner in the face amount of $2,500, on which unpaid interest accrued from January 1, 1940, to October 31, 1941, amounted to $320.83. On October 17, 1941, petitioner received from Chicago, Illinois, from Walter P. Paecke, the husband of Elizabeth P. Paecke, a telegram reading as follows:

Please wire collect your best bid for two thousand five hundred Denman Tire and Rubber income bonds owned by my wife. Feel we should receive approximately sixty for them.

Petitioner replied to the telegram on the same day as follows: "Retel this is firm offer of fifty flat for bonds." Petitioner's offer was accepted and the $2,500 principal amount of petitioner's bonds was delivered to petitioner on or about October 31, 1941, upon payment by petitioner of the agreed sum of $1,250. These bonds were thereupon canceled under date of October 31, 1941, and a liability for $2,500 principal and $320.83 interest as of October 31, 1941, was thereby eliminated.

At the time of the discharge of petitioner's indebtedness to the United States Government for $50,000 and at the time of petitioner's purchase of its bonds from Elizabeth H. Paecke, as above set forth, petitioner was in an unsound financial condition and was unable to meet its obligations as they matured, but was not insolvent in the sense that the total value of its assets was less than the amount of its liabilities before or after the discharge of these items of indebtedness.

In its corporation income and declared value excess profits tax return for 1941, which was filed March 14, 1942, petitioner reported as "Other Income, Gain on Settlement of Indebtedness $75,500.00" and "Excess of Face Value over Cost of Bonds Repurchased $1,570.83." This return showed a net loss of $4,990.87, and no tax was paid for 1941. Petitioner did not at the time of making and filing this return make and file with the return its consent to the regulations prescribed under section 113 (b) (3) of the Internal Revenue Code then in effect.

On April 21, 1944, petitioner filed with the collector of internal revenue for the eighteenth district of Ohio, at Cleveland, a claim for refund on Form 843, claiming a refund of $32,294.73 of the income tax theretofore paid by petitioner with reference to the calender year 1942, and contemporaneously therewith filed an amended income and declared value excess profits tax return for the year 1941, in which

$75,500 of surplus credit resulting from the elimination of the $125,500 indebtedness to the United States Government by payment of $50,000, as above set forth, and $1,392.23 of the surplus credit resulting from the purchase for $1,250 of petitioner's bonds in the face amount of $2,500, with accrued interest in the amount of $320.83, for retirement, as above set forth, were excluded from gross income in the computation of taxable income for the year 1941, thereby reporting a net loss of $81,883.10 for the calendar year 1941, instead of $4,990.87 net loss as shown on the original return. With this amended return petitioner filed a "consent" on Form 982 to the adjustment of the basis of its property under section 113 (b) (3) by the $76,892.23 of surplus credits representing cancellation of indebtedness so excluded from gross income in the amended return for the year 1941.

OPINION.

The question presented under these issues is whether respondent erred in refusing to increase petitioner's net loss carry-over from 1941 by excluding from its income for that year $75,500 arising from a cancellation of indebtedness due the United States Government and $1,570.83 arising from a $1,250 purchase by petitioner of $2,500 face value of its bonds, plus interest of $320.83 accrued.

As has been found in our above findings, petitioner returned these amounts as part of its income for the year 1941 on its original return, but it paid no tax for 1941, because even with these amounts returned as income, a loss was still shown on the return of $4,990.87. The Commissioner in his determination of the deficiencies has left these amounts undisturbed as petitioner first returned them and has allowed it a net loss carry-over from 1941 of the sum of $4,534.04, instead of $4,373.59 as claimed on petitioner's original return for 1942 and $81,265.82 as claimed on its claim for refund filed on April 21, 1944.

As has been found in our findings of fact, petitioner on April 21, 1944, filed an amended return for 1941 in which it excluded from net income the above described items of $75,500 and $1,392.23 of the income reported in 1941 from the purchase of $2,500 face value of its bonds, and also filed on Form 982 a "consent of corporation to adjustment of basis of its property under section 113 (b) (3) of the Internal Revenue Code." It now contends that in the first place the $75,500 gain from the cancellation of indebtedness was never taxable income at all, under *Helvering* v. *American Dental Co.*, 318 U. S. 322, and should be excluded from income on that account. It also contends in the alternative that, if it is wrong in contending that the $75,500 was never taxable income, nevertheless, the consent which it filed on Form 982 with its amended return for 1941 filed April 21, 1944, was timely and that because of the filing of this consent the $75,500 gain from

the cancellation of indebtedness and $1,392.23 of the gain resulting from purchase of its bonds should be excluded from income and a corresponding reduction in its basis of cost of assets acquired from its predecessor should be made, as provided in section 113 (b) (3) of the code.

Petitioner is, of course, privileged to make these contentions even though they are contrary to the way the petitioner treated the transactions on its original return. We shall now examine these respective contentions.

Petitioner cites *Helvering* v. *American Dental Co., supra*, to support its contention that the unpaid balance of the excise taxes remaining after the compromise payment is not taxable income because it represented a gift by the United States Government. *Helvering* v. *American Dental Co., supra*, must be examined in the light of *Commissioner* v. *Jacobson*, 336 U. S. 28, which tells us that there can be a gift only when the intent to make a gift is present. In that case the Supreme Court said:

* * . * Both the general provisions for taxation of income and this provision for the exclusion of gifts from gross income, for income tax purposes, have been in the Federal Income Tax Acts in substantially their present form since the Revenue Act of 1916. The contrast between the provisions is striking. The income taxed is described in sweeping terms and should be broadly construed in accordance with an obvious purpose to tax income comprehensively. The exemptions, on the other hand, are specifically stated and should be construed with restraint in the light of the same policy. * * *

From the facts it is plain that petitioner reached a settlement figure with the Government through prolonged negotiations wherein the Government neither expressly nor impliedly manifested any intention of making a gift to petitioner. It was seeking the best settlement it could get from a corporation in an unsound financial condition, but not insolvent. Cf. *1180 East 63rd Street Building Corporation*, 12 T. C. 437, in which we said: "We also note the unlikeliness of officers charged with the collection of state taxes having the intent of making a gift to taxpayers." We are unable to find that the unpaid balance of the compromised tax liability constituted a gift and, therefore, the Government's release of $75,500 of its claim against petitioner is not excludable from gross income under section 22 (b) (3) of the Internal Revenue Code.

Petitioner further contends that, should we hold that the cancellation of the indebtedness is not a gift, it should be treated as a reduction of the purchase price. *Hirsch* v. *Commissioner*, 115 Fed. (2d) 656; *Commissioner* v. *Sherman*, 135 Fed. (2d) 68; *Helvering* v. *Killian Co.*, 128 Fed. (2d) 433; *Gehring Publishing Co.*, 1 T. C. 345. These cases involve purchase money obligations and a reduction of the obligation occasioned by a corresponding decline in value of the

property which gave rise to the obligation. We have no corresponding situation here. Petitioner took over the assets of its predecessor and assumed its liabilities, including the tax liability owing the United States Government. A part of the purchase price of the assets which petitioner acquired from its predecessor was the assumption and agreement to pay these excise taxes to the United States Government. There is no evidence that these properties had declined in value, and even if they had, the United States Government was not the seller of these properties, and in accepting the compromise settlement was not in any way undertaking to reduce the purchase price of assets which petitioner had acquired from its predecessor. We do not desire to extend the rule of *Hirsch* v. *Commissioner, supra,* to the present situation, and that is especially true where, as here, statutory relief of a similar nature was available to petitioner under section 22 (b) (9) of the Internal Revenue Code.

The statutory relief referred to is the relief petitioner seeks to gain under its third argument if its first and second arguments fail. Section 22 (b) (9), which is printed in the margin,[1] provides for the exclusion from gross income of the income from the discharge of certain indebtedness of a corporate taxpayer in an unsound financial condition, if the taxpayer makes and files at the time of filing the return its consent to the regulations prescribed under 113 (b) (3) then in effect. Section 19.22 (b) (9)-1, Treasury Regulations 103, applicable to the year 1941, reads in part as follows:

SEC. 19.22 (b) (9)-1. *Income from discharge of indebtedness.*—Section 22 (b) (9) provides a method whereby a corporation may elect to have excluded from

---

[1] SEC. 22. GROSS INCOME.

\* \* \* \* \* \* \*

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\* \* \* \* \* \* \*

(9) INCOME FROM DISCHARGE OF INDEBTEDNESS.—In the case of a corporation, the amount of any income of the taxpayer attributable to the discharge, within the taxable year, of any indebtedness of the taxpayer or for which the taxpayer is liable evidenced by a security (as hereinafter in this paragraph defined) if—

(A) it is established to the satisfaction of the Commissioner, or

(B) it is certified to the Commissioner by any Federal agency authorized to make loans on behalf of the United States to such corporation or by any Federal agency authorized to exercise regulatory power over such corporation,

that at the time of such discharge the taxpayer was in an unsound financial condition, and if the taxpayer makes and files at the time of filing the return, in such manner as the Commissioner, with the approval of the Secretary, by regulations prescribes, its consent to the regulations prescribed under section 113 (b) (3) then in effect. In such case the amount of any income of the taxpayer attributable to any unamortized premium (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be included in gross income and the amount of the deduction attributable to any unamortized discount (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be allowed as a deduction. As used in this paragraph the term "security" means any bond, debenture, note, or certificates or other evidence of indebtedness, issued by any corporation, in existence on June 1, 1939. This paragraph shall not apply to any discharge occurring before the date of the enactment of the Revenue Act of 1939 [June 29, 1939], or in a taxable year beginning after December 31, 1942.

its gross income the amount of income attributable to a discharge, within the taxable year, of its indebtedness or of indebtedness for which it is liable as, for example, in the case of a debt arising from an assumption of liability of another corporation. To be entitled to the benefits of the provisions of section 22 (b) (9) a corporation must (1) file with its return for the taxable year a consent to the provisions of the regulations, in effect at the time of the filing of the return, prescribed under section 113 (b) (3) (see sections 19.113 (b) (3)–1 and 19.113 (b) (3)–2, relating to adjustment of basis), and (2) establish that it was in an unsound financial condition immediately preceding the discharge of the indebtedness.

Respondent apparently concedes that under section 22 (b) (9) petitioner would be entitled to exclude the $75,500 from gross income, and also $1,570.83 gain from repurchase of its bonds, if petitioner had filed its consent with its original return. Petitioner, however, did not file its consent with its original return but, on the contrary, reported in its income $75,500 as "Gain on Settlement of Indebtedness" and $1,570.83 as "Excess of Face Value over Cost of Bonds Repurchased." Later on, in April, 1944, petitioner filed an amended return in which it excluded the $75,500 and $1,392.23 of the $1,570.83 from income and filed the consent provided in section 22 (b) (9) of the code. Petitioner contends that the filing of such consent in 1944 with an amended return satisfies the requirements of section 22 (b) (9), because that section does not require the consent to be filed with the original return. In support of its contention, petitioner cites cases arising under section 131 (a) (1) of the Internal Revenue Code. *W. K. Buckley, Inc.* v. *Commissioner*, 158 Fed. (2d) 158; *Gentsch* v. *Goodyear Tire & Rubber Co.*, 151 Fed. (2d) 997; *Connor* v. *United States*, 19 Fed. Supp. 97; *Ralph Leslie Raymond*, 34 B. T. A. 1171. In these cases a consent filed with an amended return was sufficient to obtain credit for foreign taxes under a statute which required the taxpayer to signify his desire to have the credit "in his return." These cases involved an adjustment of the tax for the year in which the credit was desired. It was held that taxpayers who determined no tax liability for that year were later entitled to claim their credit under section 131 (a) (1) when it was discovered that there was a tax liability for that year.

In the instant proceeding, however, petitioner's amended return, as well as its original return, discloses a net loss. Petitioner was fully cognizant of all the facts at the time of filing its original return. There was apparently good reason for not filing its consent with the original return. As we have already pointed out, that return showed a loss and no tax due, even with these amounts returned as income. The only effect of filing such a consent at that time would have been to reduce petitioner's basis of its assets for future years. This, it doubtless decided, it did not want to do. In so far as we can see, it was only because petitioner sought to reduce its tax liability for a later year, the

year 1942, by a larger net loss carry-over that petitioner filed its amended return for 1941, in April, 1944, accompanied by the consent on Form 982. This, we think, was too late.

Section 22 (b) (9) was intended as a relief measure for certain taxpayers whose debt structure had been favorably changed. It was intended to postpone the taxation of what would ordinarily constitute income in that year to a later period, when its assets were disposed of.[2] We do not think that Congress intended section 22 (b) (9) to be used as a method for reducing taxes in years subsequent to the cancellation of the indebtedness by increasing a net loss carry-over. We hold, therefore, that petitioner's election in its amended return was not an election contemplated by section 22 (b) (9) and, therefore, the $75,500 is includible in petitioner's taxable income for 1941. Cf. *J. E. Riley Inv. Co.* v. *Commissioner,* 311 U. S. 55.

With reference to the transaction involving the purchase of petitioner's bonds at a discount, petitioner concedes on brief that this transaction is clearly within the rule of *Commissioner* v. *Jacobson, supra,* and taxable income was realized thereon if petitioner has not complied with the requirements of section 22 (b) (9). The amended return filed by petitioner for the year 1941 in April, 1944, excluded from its gross income $1,392.23 of the amount realized from the purchase of its bonds and consented to the adjustment of the basis of its property under section 22 (b) (9) by said amount. We have decided that petitioner's election with respect to the $75,500 income from the settlement of the Government's claim for taxes was not an election contemplated by section 22 (b) (9). The same conclusion must be reached with respect to petitioner's purchase of its bonds at a discount and, therefore, the $1,570.83 mentioned in assignment of error (b) is includible in petitioner's taxable income for the year 1941.

*Issue (c).*

#### FINDINGS OF FACT.

With respect to the year 1942, petitioner made additions to its furniture and fixtures of $1,507.12 and is entitled to depreciation of $50.24 thereon. This is in addition to the depreciation allowed in the deficiency notice.

#### OPINION.

Petitioner is entitled to an additional allowance of $50.24 representing depreciation for the year 1942 and effect will be given thereto in a recomputation under Rule 50.

---

[2] H. R. Rept. No. 855, p. 5, 76th Cong., 1st sess. ; S. Rept. No. 648, pp. 2–3, 76th Cong., 1st sess.

## *Issue (d)*

### FINDINGS OF FACT.

With respect to the year 1943, petitioner made additions to its molds and cores costing $9,072.21, additions to furniture and fixtures of $1,433.15, and additions to machinery and equipment of $210.45. Petitioner is entitled to depreciation of $907.22 on molds and cores, $47.77 on furniture and fixtures, and $7.02 on machinery and equipment purchased in 1943. This is in addition to the depreciation allowed in the deficiency notice.

### OPINION.

Petitioner is entitled to an additional allowance of $962.01 representing depreciation for the year 1943 and effect will be given thereto in a recomputation under Rule 50.

## *Issue (e)*

### FINDINGS OF FACT.

Petitioner began business on October 1, 1937, and for the three-month taxable period ended December 31, 1937, had no bad debt losses, and no bad debt deductions were claimed on petitioner's income tax returns. The income tax returns of petitioner filed for the calendar years 1938 and 1939 claimed bad debt deductions of $49,976.88 and $60,024.66, respectively. On examination of these returns by the Bureau of Internal Revenue certain adjustments were made to these bad debt deductions and the amounts deductible for said years were determined to be $46,316.89 for the year 1938 and $58,896.28 for the year 1939. An analysis and a breakdown of these bad debt deductions show them to be made up as follows:

|  | 1938 | 1939 |
|---|---|---|
| Losses on defalcations: | | |
| "A" | ----------- | $2,275.00 |
| "B" | ----------- | 28,265.13 |
| | | 30,540.13 |
| Other losses on bad debts: | | |
| On accounts receivable taken over from the predecessor corporation on 10/1/37 | $8,851.72 | 10,590.45 |
| On sales during period 10/1/37 to 12/31/37 | 18,600.83 | 65.88 |
| On sales during 1938 | 18,864.34 | 12,476.29 |
| On sales during 1939 | ----------- | 4,790.98 |
| Employee accounts and miscellaneous | ----------- | 432.55 |
| | 37,465.17 | 17,765.70 |
| Total | 46,316.89 | 58,896.28 |

No losses from defalcations have ever been sustained by petitioner from the date of its incorporation on June 28, 1937, down to the date of the filing of the petition in these proceedings on June 7, 1948, except in two instances: One in the amount of $2,275 and the other in the amount of $28,265.13, both of which were included in the so-called "bad debt" deductions for the year 1939. These losses were sustained as a result of embezzlements of funds of petitioner by two of its employees. The losses were discovered by petitioner in 1939 and were claimed as bad debt deductions on petitioner's income tax return for the year 1939, and they were so treated by respondent.

Among the assets taken over by petitioner from its predecessor corporation pursuant to the plan of reorganization were accounts receivable aggregating $191,299.67. During the taxable periods subsequent to October 1, 1937, various accounts included in the total so taken over were charged off and claimed and allowed as bad debt deductions on petitioner's income tax returns, as follows:

| | |
|---|---|
| 10/1/37–12/1/37 | $0.00 |
| 1938 | 8,851.72 |
| 1939 | 10,590.45 |
| 1940 | 0.00 |

In the computation of the excess profits credit of petitioner based on income for the calendar years 1941, 1942, and 1943, and the unused excess profits credit of petitioner for the year 1941, respondent has not disallowed as deductions in computing excess profits net income for the years 1938 and 1939 the following items which are claimed by petitioner as "class abnormalities" pursuant to the provisions of section 711 (b) (1) (J) (i) of the Internal Revenue Code:

(a) Losses on defalcations in the year 1939 in the amount of $30,540.13.

(b) Bad debt losses on accounts receivable taken over from Petitioner's predecessor corporation, in the amount of $8,851.72 in the year 1938 and in the amount of $10,590.45 in the year 1939.

These losses deducted by petitioner represented deductions of a "class abnormal" for petitioner as that term is used in section 711 (b) (1) (J) (i) of the Internal Revenue Code. The abnormality was not a consequence of an increase in the gross income of petitioner in the base period or a decrease in the amount of some other deduction in its base period, and was not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

OPINION.

The question presented under this issue is whether the bad debt losses in 1938 and 1939 on accounts receivable taken over from petitioner's predecessor and certain losses on defalcations in the year 1939

were deductions of a class abnormal for petitioner and should, therefore, be restored to petitioner's excess profits net income for the purpose of determining its excess profits tax credit for the taxable years herein.

Petitioner contends that these deductions were of a class abnormal for petitioner within the meaning of section 711 (b) (1) (J) (i) of the Internal Revenue Code. The pertinent provisions of the Internal Revenue Code are printed in the margin.[3] Respondent contends that these bad debt losses were not of a "class" abnormal for petitioner and, therefore, if petitioner is entitled to any relief it would be by reason of section 711 (b) (1) (J) (ii).

The record shows that the losses on defalcations were included in petitioner's bad debt deductions. Aside from these losses, petitioner has never sustained any loss on defalcations. While the loss on defalcations is properly deductible under section 23 (f) of the Internal Revenue Code as a loss from theft, *First National Bank of Sharon* v. *Heiner*, 66 Fed. (2d) 925, petitioner took these losses, and they were allowed, as bad debt deductions. Petitioner could have taken the deductions under section 23 (f) and the same result would follow under section 711 (b) (1) (E). Cf. *Schneider Grocery Co.*, 10 T. C. 1275. Petitioner has proved that the losses on defalcations were not due to any of the limiting factors of section 711 (b) (1) (K) and, therefore, the deductions are to be restored to income for the purpose of determining petitioner's excess profits tax credit. Cf. *William Leveen Corporation*, 3 T. C. 593.

---

[3] SEC. 711. EXCESS PROFITS NET INCOME.

\* \* \* \* \* \* \*

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made (for additional adjustments in case of certain reorganizations, see section 742 (e)) :

\* \* \* \* \* \* \*

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) RULES FOR APPLICATION OF SUBPARAGRAPHS (H), (I), AND (J).—For the purposes of subparagraphs (H), (I), and (J)—

\* \* \* \* \* \* \*

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

The next question is whether the bad debt losses sustained by petitioner in 1938 and 1939 on accounts receivable taken over from petitioner's predecessor represent deductions of a class abnormal to petitioner.

*Green Bay Lumber Co.*, 3 T. C. 824, stands for the proposition that the classification under section 711 (b) (1) (J) (i) of the Internal Revenue Code does not have to be in accordance with the statutory deduction category of section 23 of the Internal Revenue Code. It is possible under section 711 (b) (1) (J) (i) to have two or more distinct and separate classes of bad debts. The determination that a particular group of bad debt deductions constitutes a distinct and separate class within the meaning of section 711 (b) (1) (J) (i) is largely one of fact. *Green Bay Lumber Co., supra*. The bad debts of the predecessor corporation were the result of sales to customers whose financial responsibility was not subject to petitioner's investigation. This is in direct contrast to the bad debts which were the result of sales made by petitioner after entering business in 1937. Section 711 (b) (1) (J) (i) was added by section (3) of the Excess Profits Tax Amendments of 1941 and has always remained as originally enacted. The purpose of the 1941 amendments was to liberalize the Second Revenue Act of 1940. The following quoted excerpts from House Report No. 146, 77th Cong., 1st sess., p. 3, refer to section (3) of the 1941 amendments:

(2) It adds to the list of adjustments for specific items of abnormal deductions, set out in 711 (b) of the existing law, the further adjustment for abnormal deductions *of any* class during the years in the base period. [Emphasis supplied.]

On page 5 of this report the following appears:

In addition to the adjustments for the deductions specified by the present law the amendments made by this section provide that any deduction will be disallowed for the base period if it was *of a class abnormal* for the taxpayer. [Emphasis supplied.]

Senate Report No. 75, 77th Cong., 1st sess., pp. 3 and 5, is to the same effect as the above quoted section from the House report.

We believe that it is reasonable to find that the debts taken over by petitioner from its predecessor were of a different class from those of its own which it acquired in the sale of goods after it began business. Petitioner was not in existence prior to the time it took over the accounts receivable of its predecessor and, therefore, it can not be said that the deductions were a result of a change in the method of operation of the business. On these facts the instant proceeding is distinguishable from *Pacific Gas & Electric Co.*, 7 T. C. 1142.

Petitioner, having shown that abnormal deductions resulted from factors other than described in section 711 (b) (1) (K), is entitled to

have these deductions restored to income. Cf. *Lorenz Co.*, 12 T. C. 263; *William Leveen Corporation, supra.*

*Issue (f).*

FINDINGS OF FACT.

In the base period years petitioner charged off bad debts on its sales made subsequent to its formation in 1937. The amounts of the bad debts charged off through 1940, together with the gross income and gross sales in each of these years, were as follows:

|  | Bad debts | Gross income | Gross sales |
|---|---|---|---|
| Oct. 1 to Dec. 31, 1937 | | $39,441.88 | $306,712 |
| 1938 | $37,465.17 | 399,390.64 | 1,493,745 |
| 1939 | 17,333.15 | 685,108.39 | 2,454,496 |
| 1940 | 15,843.38 | 472,364.63 | 1,859,630 |

Petitioner had expenditures for advertising in the years 1938 through 1940 in the following amounts:

| | |
|---|---|
| 1938 | $16,113.48 |
| 1939 | 39,446.18 |
| 1940 | 23,959.36 |

The petitioner had incurred expenses for "Professional Services" during the years 1938, 1939, and 1940 in the following amounts:

| | |
|---|---|
| 1938 | $1,782.56 |
| 1939 | 5,647.90 |
| 1940 | 4,629.71 |

The petitioner had expenses for "Factoring Commissions" during the years 1939 and 1940. These commissions represented the cost to petitioner of financing its accounts receivable. The expenses were as follows:

| | |
|---|---|
| 1937 | $0.00 |
| 1938 | 0.00 |
| 1939 | 16,872.09 |
| 1940 | 19,180.88 |

The petitioner had expenses for repairs in the years 1938, 1939, and 1940 in the following amounts:

| | |
|---|---|
| 1938 | $16,100.83 |
| 1939 | 37,638.54 |
| 1940 | 27,803.32 |

The following extracts are from a letter written by petitioner's president and received on January 26, 1940, in the Office of the Chief Counsel of the Bureau of Internal Revenue:

The factory has been maintained at maximum efficiency by the addition of modern equipment and by constantly improved and modern manufacturing methods, and as a result the plant is vastly improved over its condition two years ago, and may be considered one of the best units of the tire industry.

During 1938 additions to the plant accounts amounted to $23,620.16 and in 1939 amounted to $37,424.98, making a total of $61,045.14 for the two year period.

This addition to manufacturing facilities, plus our hand-custom-building precision methods and expert workmanship, enable us to produce a tire that is absolutely second to none.

Merchandising methods have been revised to eliminate the sale of special brand merchandise to large distributors in favor of developing sales of the company's own brand quality tires.

1939 is the first whole year with the operation of the present sales force, and during that year many new dealers became associated with the company.

Tables of figures are contained in the stipulation which show the respective amount abnormalities of bad debt deductions, advertising expenses, professional services, factoring commissions, and expenses for repairs for use in a recomputation under Rule 50 if petitioner is sustained on this issue. These figures are quite extensive and more or less complicated and it is believed unnecessary to incorporate them here. The stipulation of facts has been incorporated by reference, *supra*, as a part of our general findings of fact.

OPINION.

As to petitioner's claim that abnormality in amount of bad debt deductions for 1938 as defined by section 711 (b) (1) (J) (ii) should be disallowed, we think petitioner should be sustained. Clearly, according to the figures which have been stipulated there was this abnormality in amount of bad debt deductions for 1938. We do not understand that respondent contends otherwise. He does contend, however, that petitioner has not met its burden of proof in showing that the abnormality in amount was not due to the limiting factors mentioned in section 711 (b) (1) (K) (ii). The stipulated facts, taken with other evidence at the hearing, convince us that the excess in amount of 1938 bad debt deductions was not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period and was not a consequence of a change at any time in the type, manner of operation, size or condition of the business engaged in by the taxpayer. These are the factors covered by section 711 (b) (1) (K) (ii). We, therefore, sustain petitioner in its claim that bad debt deductions in 1938 which were abnormal in amount as that term is used in the statute should be disallowed. Cf. *O. Hommel Co.*, 8 T. C. 383.

As to petitioner's claim that it had abnormal deductions, excessive in amounts, for 1939 in advertising, professional services, factoring commissions and repairs which should be disallowed, we do not think it can be sustained. Here again we do not understand the Commissioner to contend that these deductions were not abnormal in amounts for 1939 as defined by the applicable statute. He does contend, however, that petitioner has not met its burden of proof by showing that the abnormality in amounts was not due to some of the limiting factors contained in section 711 (b) (1) (K) (ii). After careful examination of all the facts, we think respondent must be sustained as to these particular items. The letter written by petitioner's president to the Office of the Chief Counsel of the Bureau of Internal Revenue shown in our findings of fact discloses that petitioner, after it acquired the plant and business of its predecessor, very considerably improved and expanded its business. We think it is reasonable to assume that the increases in amounts in 1939 of petitioner's expenditures for advertising, professional services, factoring commissions, and repairs were due, in part at least, to some of the limiting factors enumerated in section 711 (b) (1) (K) (ii). At least petitioner has not convinced us that such was not the case. Cf. *William Leveen Corporation, supra*. We, therefore, sustain the Commissioner in his refusal to disallow these particular amount abnormalities.

*Issue (g).*

### FINDINGS OF FACT.

In making the growth formula computation appearing in the deficiency notice, respondent failed to take into account the loss of $1,560.70 for the year 1937 as reducing the income of the first half of the base period as required by section 713 (f) of the Internal Revenue Code.[4]

### OPINION.

In a recomputation under Rule 50 the loss of $1,560.70 for the year 1937 should be taken into account as reducing petitioner's income of the first half of the base period in making the growth formula computation.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

ARUNDELL, *J.*, dissents on the first issue.

---

[4] See also G. C. M. 23,047, 1942-1 C. B. 141; G. C. M. 23,650, 1944 C. B. 398.